Cherryl STEWART, Appellant–
Defendant,

v.

RANDOLPH COUNTY OFFICE OF
FAMILY AND CHILDREN,
Appellee–Plaintiff.

No. 68A01–0312–JV–462.

Court of Appeals of Indiana.

March 19, 2004.

Alan K. Wilson, Public Defender, Muncie, IN, Attorney for Appellant.

Suzan Dillon Myers, Winchester, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Cherryl Stewart ("Mother") appeals from the trial court's termination of her parental rights with respect to her children G.B., N.B., M.P., and H.S. She presents the following issues for our review:

1. Whether she was denied her right to due process when the Randolph County Office of Family and Children ("OFC") created case plans.

2. Whether the OFC made all reasonable efforts to avoid termination of her parental rights.

3. Whether the trial court made sufficiently specific written findings and conclusions to support its dispositional decrees.

We affirm.

### FACTS AND PROCEDURAL HISTORY

N.B. was born March 31, 1993; M.P. was born March 27, 1995; G.B. was born January 15, 1998; and H.S. was born November 10, 1999. Three different men fathered the children, and none of those men are parties to this appeal. In 2000, the children lived with Mother, Mother's then-boyfriend Charles Stewart, and two other children in an apartment in Winchester.

In August 2000, someone called the Winchester Police Department to report that three of Mother's young children were in the apartment alone. The responding officer observed that the apartment was exceptionally dirty and contacted the OFC. Joy Ann Woolf, a family case manager for the OFC, arrived at Mother's apartment that evening to investigate. She observed that the apartment was crowded, with only three bedrooms for eight people, and that it was "very dirty." Mother cleaned the apartment, and when Woolf returned the next day, she observed that it was "much better than it had been." But Woolf initiated a service referral agreement, whereby Mother contracted with the OFC to participate in home-based services through Dunn Center, to keep the apartment clean, and to make sure that her older children went to school.

Thereafter, there were other occasions when the young children were left at the apartment unattended. Then in June 2001, a Winchester police officer contacted Woolf to report that M.P., then six years old, was found alone in front of an Arby's restaurant on State Road 32, having walked there by himself. Mother and Stewart were home, but were not aware that M.P. was missing. The police arrested Mother and Stewart for neglect of a dependent, and on June 18, 2001, the OFC filed petitions alleging that each of the children were in need of services ("CHINS"). The OFC placed the children in foster care.

At an initial hearing on July 2, 2001, Mother admitted the factual allegations in each of the CHINS petitions, and on August 23, 2001, the trial court issued dispositional decrees for each of the children.

Those decrees provided in relevant part that each of the children was to remain in foster care, that Mother have visitation with the children, and that Mother continue to participate in home-based services and counseling. The children were returned to Mother's home in May 2002, but they were removed again in November 2002 because Mother was not complying with her case plans.

The OFC filed petitions for the involuntary termination of her parental rights with regard to each of the four children in December 2002. Following fact-finding hearings, the trial court ordered that Mother's parental rights be terminated on July 31, 2003. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Case Plans

 The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. *A.P. v. Porter County Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind.Ct.App.2000), *trans. denied.* Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. *Id.* A case involving the State's authority to permanently sever a parent-child bond demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake. *Id.* "Although due process has never been precisely defined, the phrase expresses the requirement of 'fundamental fairness.' " *E.P. v. Marion County Office of Family*

*and Children,* 653 N.E.2d 1026, 1031 (Ind. Ct.App.1995).

 Mother first contends that the OFC did not negotiate her case plans with her and that she was denied her right to due process as a result. Indiana Code Section 31-34-15-2 provides as follows: "The county office of family and children, *after negotiating with the child's parent,* guardian, or custodian, shall complete a child's case plan not later than sixty (60) days after: (1) the date of the child's first placement; or (2) the date of a dispositional decree; whichever comes first." (Emphasis added).

In support of her contention, Mother refers us to the following excerpt of Woolf's testimony at one of the fact-finding hearings in this case:

Q: But are you familiar with the statute I'm talking about that requires negotiation between you and [Mother] prior to those case plans being made up?

A: I know there is now. I'm not sure when that statute came into effect.[1]

Q: So if it was in effect then, you didn't follow it; is that correct?

A: Right. Correct. I didn't have a case conference, sit down with [Mother] and say, "What do you think you need to do or what do you think the kids need to do and I need to do?" We did discuss it in a—

Q: I understand. You've answered the question. . . .

Mother maintains that this evidence shows that the OFC did not comply with Indiana Code Section 31-34-15-2 when it completed her case plans. We cannot agree.

 Neither the statute nor relevant case law explains what type of negotiation is required in establishing a case plan.

---

1. Indiana Code Section 31-34-15-2 was added in 1997.

The interpretation of a statute is a question of law reserved for the courts. *State v. Rans*, 739 N.E.2d 164, 166 (Ind.Ct.App. 2000), *trans. denied.* If the language of a statute is clear and unambiguous, it is not subject to judicial interpretation. *Id.* However, when the language is susceptible to more than one construction, we must construe the statute to determine the apparent legislative intent. *Id.* Our task with respect to statutory interpretation has been summarized as follows:

> We ascertain and implement legislative intent by "giving effect to the ordinary and plain meaning of the language used in the statute." The statute is examined and interpreted as a whole and the language itself is scrutinized, including the grammatical structure of the clause or sentence at issue. Within this analysis, we give words their common and ordinary meaning, without "overemphasizing a strict literal or selective reading of individual words."

*Id.* (quoting *Clifft v. Indiana Dep't of State Revenue*, 660 N.E.2d 310, 316 (Ind.1995) (citations omitted)).

Black's Law Dictionary defines "negotiate" as "[t]o communicate with another party for the purpose of reaching an understanding ... [or][t]o bring about by discussion or bargaining." *See* BLACK'S LAW DICTIONARY 1059 (7th ed.1999). Here, Woolf testified as follows:

Q: Ms. Woolf, how did you form the case plans?

A: We, [Mother] and myself and the service providers that worked with her, we would have case conferences.

We would discuss what services and what activities [Mother] needed to be working to get the children back in her home and what to do once the children were back. And then I would write the case plans after the case conference.

Woolf testified further that she reviewed each of the case plans with Mother and "asked her if she had any problems with any of the responsibilities" before asking Mother to sign them. And Woolf stated that had Mother expressed any such problems, she "would have corrected them." Moreover, Mother was represented by counsel at every stage of the proceedings, and she never objected to the requirements set out in the case plans.

In light of the evidence, we conclude that the OFC complied with Indiana Code Section 31–34–15–2 when it completed her case plans. *Cf. A.P.*, 734 N.E.2d at 1113 (noting no evidence that OFC negotiated case plans with parents; specifically, parents did not sign case plans). Woolf discussed the terms of the case plans and asked Mother whether she objected to any of those terms before Mother signed them. Mother has not demonstrated that she was denied her right to due process.[2]

**Issue Two: Every Reasonable Effort**

Mother next contends that the trial court abused its discretion when it terminated her parental rights because "not every reasonable effort" was made to maintain the parent-child relationships at issue. The record reveals that the trial court entered specific findings and conclu-

---

2. Mother also contends that she was not provided with copies of the case plans in a timely manner as required by Indiana Code Section 31–34–15–2 and that John Boyd, the children's foster parent, was not involved in the development of the case plans as required by Indiana Code Section 31–34–15–5. But Mother does not cite to any evidence to sup-

port her first contention, and she does not demonstrate how she was harmed by her second contention. The evidence shows that Mother understood what was expected of her under the case plans and that Boyd was actively involved in fulfilling the terms of the case plans with respect to the children's needs.

sions on its own motion. As a result, the specific findings control only as to the issues they cover, and a general judgment standard controls as to the issues upon which the court has not made findings. *Matter of D.G.*, 702 N.E.2d 777, 780 (Ind. Ct.App.1998). The specific findings will not be set aside unless they are clearly erroneous and we will affirm a general judgment on any legal theory supported by the evidence. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it. *Id.* In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* Rather, we consider only the evidence and reasonable inferences drawn therefrom which support the judgment. *Id.*

■ Termination is intended as a last resort, available only when all other reasonable efforts have failed. *In re W.B.*, 772 N.E.2d 522, 528 (Ind.Ct.App.2002). Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The trial court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 529.

■ Here, the OFC arranged for the following services to assist Mother and her children: a homemaker and home-based services; counseling services for Mother at Dunn Center; family therapy; First Steps Early Intervention for H.S.; speech therapy for G.B.; parenting classes; and adult basic education courses for Mother. Woolf testified that Mother "had difficulty implementing what she learned" through the services provided to her. And Woolf testified that the children benefited from foster care. For instance, H.S. and G.B.'s speech "greatly improved," and N.B.'s grades "greatly improved" while they were in foster care. Woolf testified that she believed termination was in the children's best interests.

Mother's sole contention on this issue is that the OFC failed to offer her assistance through a program called Wraparound. Mother maintains that had she been offered that service, she would have been better able to comply with her case plans. Paula Major, a therapist at Dunn Center, recommended that Mother enroll in the Wraparound program, and she testified at one of the fact-finding hearings as follows:

A: [Wraparound is] a Randolph County program. It provides a system of care and it focuses, it works with the client's strengths and it establishes what they call a family team where the client and the Wraparound coordinator select a team of eight to ten people that the client thinks would be supportive in helping her reach her goals or reach the family goals. And it could include OFC, Dunn Center, a neighbor, a minister, a friend, anyone that the family feels would help them meet their goals and then the team has a coordinator and everyone gets together and looks at the goals and gives the goals priorities and then they divide the goals into achievable steps. And people are given responsibility for the steps and they're made accountable to the coordinator.

Q: How do you think [Mother] and her family might benefit from that program?

A: I personally feel that that's what [Mother] needs. I think she would greatly benefit from the program.

Q: And how?

A: In working with [Mother] I felt that she made a real effort to comply with everything that was being asked of her and I feel that she got over-

whelmed because there were so many demands, and I think that she would benefit from this program because there would be one coordinator and the coordinator doesn't provide services, they just coordinate services. And they could help [Mother] stay on track and the coordinator would be able to identify conflicts and areas where [Mother] needs extra help or support. There's also a consortium that meets once a month with the Wraparound team and that's people from the community, and if there's a need that isn't being met or can't be met, like financial or maybe an automobile or anything, the coordinator can take that need to the consortium. And I've been to a couple of the consortium meetings where people have identified needs and there's always someone at that consortium that has a referral source or can provide help to meet that need.

* * *

[Cross-examination]

Q: Are you aware of all the services that have been provided to [Mother]?

A: I'm aware of what has been provided through Dunn Center, and I am aware that I believe a homemaker was sent to [Mother's] home from OFC.

* * *

Q: Do you know, does Wraparound refer to Dunn Center for services?

A: They don't refer.

Q: Do they use Dunn Center for services such as home-based or individual counseling or group counseling or parenting classes or any of the other services that Dunn offers?

A: If the client identifies that as something that she wants, it would be included in her team. If the client identified that she felt individual counseling was supportive and would help her meet her goals, then the team would make sure that she got that.

* * *

Q: Can you guarantee that Wraparound is going to be a success for [Mother]?

A: No. No, there's no guarantees. But [Mother] meets all the criteria to enter the Wraparound program. I think she has a good chance of succeeding.

* * *

Q: ... Would your office and agency not meet on somewhat of a regular basis for a case conference with an OFC case worker if there was one assigned to the case?

A: If the therapist is working with a client that is involved with OFC, they would meet with OFC on a monthly basis.

Q: Yes. So now we've established that Dunn internally, as well as externally would meet on a regular basis to consult about a particular client.

A: Yes.

Q: Probably monthly?

A: It would try to be monthly.

Q: Yes. And at those meetings would one purpose be to attempt to be informed about what the other providers were doing?

A: Yes.

Q: And would another purpose of that meeting be to try to coordinate efforts to make sure that as many or if not all of the needs that were there were being met?

A: That would be addressed, yes.

Q: Well, wouldn't that be of a primary concern?

A: It would be a concern.

Q: I mean that would be the very reason for the meeting, would it not? To identify and address those needs?

A: Yes, and to look at progress.

Q: Now, isn't that the same concept as Wraparound?

A: I don't feel that it is.

But, directly contradicting Major's testimony, Woolf testified that Wraparound provides essentially "the same services" that the OFC had already been providing to Mother and her children. For instance, Woolf explained that she and others drew up schedules to help Mother "know day by day who was supposed to be where when." The OFC homemaker and Dunn Center employees sometimes helped provide transportation to various appointments, but Mother still missed appointments. And the OFC homemaker drew up a schedule showing Mother which household chores should be done on which days of the week, but Mother still failed to keep the house clean on a consistent basis.

Mother asks us to reweigh the evidence, which we will not do. The evidence supports the trial court's determination that all reasonable efforts had been made to avoid termination of Mother's parental rights.

**Issue Three: Findings and Conclusions**

■ Finally, Mother contends that the trial court's findings and conclusions in each of the four dispositional decrees entered in August 2001, almost two years before the termination orders, do not comply with the requirements set out in Indiana Code Section 31–34–19–10. That statute provides as follows:

The juvenile court shall accompany the court's dispositional decree with written findings and conclusions upon the record concerning the following:

(1) The needs of the child for care, treatment, rehabilitation, or placement.

(2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.

(3) Efforts made, if the child is a child in need of services, to:

(A) prevent the child's removal from; or

(B) reunite the child with;

the child's parent, guardian, or custodian in accordance with federal law.

(4) Family services that were offered and provided to:

(A) a child in need of services; or

(B) the child's parent, guardian, or custodian;

in accordance with federal law.

(5) The court's reasons for the disposition.

Ind.Code § 31–34–19–10.

Mother relies on our opinion in *A.P.*, 734 N.E.2d at 1107, in support of her contention on this issue. In that case, we noted that the trial court did not provide any written findings or conclusions in its dispositional decree, but merely stated that the children were being placed in foster care. We held that the lack of findings, combined with six other procedural irregularities, warranted reversal of the termination of the parents' rights to their child. *Id.* at 1117.

But Mother's reliance on *A.P.* is misplaced. Here, in August 2001, the trial court entered the following findings and conclusions in the dispositional decree regarding G.B.:

A. Juvenile, [G.B.], is three (3) years old, having been born on January 5, 1998.

B. A Detention Hearing was held on June 5, 2001.

C. An Initial Hearing was held on July 2, 2001. Mother admitted the allegations in Paragraph 5, Sub-paragraphs a, b, and c of the Petition Alleging Child in Need of Services.

D. A Petition For Parental Participation as to Mother was filed by the Office of Family and Children on July 11, 2001.

E. The Predispositional Investigation and Report was filed by the Office of Family and Children on August 9, 2001, with the following recommendations:

1. Juvenile remain in foster care.

2. After [sibling not related to this appeal] is returned home, it is recommended that [G.B.] be the next child to be returned to his mother's care.

3. Juvenile continue to attend preschool and receive speech therapy at the medical pavilion.

4. Juvenile participate in services at Dunn Center as recommended and continue visiting his mother and siblings as currently scheduled.

5. If Juvenile is not returned home, it will be recommended that within the next few weeks, that his visitations be increased to overnight visitations.

6. Mother continue to participate in services through Dunn Center and with the homemaker.

7. Once her children are returned home, Mother will continue all the children in all the services they are currently receiving or may be recommended to receive.

F. After discussion, Mother indicates that she and current live-in boyfriend have discussed "starting another family when her oldest children move out of the home in 5–6 years;" this attitude indicates a disregard for the welfare and best interest of this Juvenile and the other six (6) siblings, since Mother is presently unable to provide proper care, custody, and control except for substantial social service providers and services including home-based services (2 days per week of 5–6 hours per day), homemaker visit (1 day per week), counseling and therapy at Dunn Center, full scale educational plan for Mother to be developed (who currently reads at 1st grade level), and further improvement in daily living skills and food preparation.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT that Juvenile, [G.B.], shall remain a ward of the Randolph County Division of Family and Children.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Juvenile shall remain in current foster placement, until further order of the Court.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Juvenile shall continue to attend preschool and receive speech therapy at the medical pavilion.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Juvenile participate in services at Dunn Center as recommended and continue visiting his mother and siblings as currently scheduled.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that Mother continue to participate in services through Dunn Center and with the homemaker.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT that the Petition for Parental Participation is granted, pursuant to the

consent of mother, and mother ... is ordered to:

1. Obtain assistance in fulfilling her obligation as the parent;

2. Provide specified care, treatment, or supervision for the child;

3. Work with any person providing care, treatment, or supervision for the child; and

4. Participate in counseling as may be directed.

The trial court entered substantively identical decrees with respect to each child, with the only differences being the particular needs of each child. For instance, the trial court ordered that N.B. and M.P. continue services through Dunn Center and that H.S. continue services through First Steps.

Mother maintains that the dispositional decrees fail to mention the children's needs; the needs for her participation in the children's care plans; the efforts that have been made to prevent the children's removal from Mother's home; and the court's reasons for ruling as it did. We cannot agree.

First, the trial court found that Mother admitted the factual allegations in paragraph 5 of each of the CHINS petitions. That paragraph states as follows:

... said child is a child in need of services as defined in I.C. 31–34–1–1 in that her physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of the child's parent, to supply the child with necessary supervision to-wit:

(a) On June 3 [2001], at approximately 2:30 P.M., an individual brought six (6) year old [M.P.] to the Winchester Police Station and stated [M.P.] was found by himself in front of the Arby's Restaurant on State Road 32 in Winchester. By driving around Winchester, [M.P.] was able to show the police where he resided. When Winchester Police made contact with mother, Cheryl Stewart and her boyfriend, Charles Stewart, at approximately 3:20 P.M., neither Mother nor Mr. Stewart were aware that [M.P.] was missing. Both [Mother] and Charles Stewart were arrested for child neglect, which left all six children residing in the home without supervision without the coercive intervention of Child Protection Services.

(b) Mother Cheryl Stewart is thirty-one (31) years old and has seven children by six different fathers. The location of fathers Valen E. Bell, Duane Price, and Dustin Pettit is unknown and they do not pay support or provide the necessary food, clothing, and shelter for their children.

(c) Prior to her arrest, Mother Cheryl Stewart was on a Service Referral Agreement with RCOFC as a result of prior complaints of lack of supervision and due to dirty home conditions, which was life and health endangering to her younger children.

And that it is unlikely that the needed care or treatment will be provided without the coercive intervention of the Court.

That finding clearly shows the trial court's reasons for the dispositions.

The trial court also found that the OFC recommended that the children remain in foster care; that the children continue to participate in their individual therapies and services at Dunn Center; that the children continue visitation with Mother as scheduled; that Mother continue to participate in services through Dunn Center and with the homemaker; and that once the children are returned home, Mother continue all of the children in the services

they were receiving or were recommended to receive. Those findings clearly outline the needs of the children and Mother and the respective services provided. And those findings also indicate an intention to return the children home if Mother successfully complied with the case plans. Indeed, the children were returned home to Mother several months after the dispositional decrees were entered. We conclude that the trial court's findings satisfy the requirements set out in Indiana Code Section 31–34–19–10.

Affirmed.

BAKER, J., and MAY, J., concur.