**COLDWELL BANKER ROTH WEHRLY GRABER, Appellant/Cross-Appellee,**

v.

**LAUB BROTHERS OIL COMPANY, INC., Douglas Laub, and Gary Laub, Appellees/Cross-Appellants.**

No. 02A05-1003-PL-134.

Court of Appeals of Indiana.

June 30, 2011.

Michael H. Michmerhuizen, Patrick G. Murphy, Fort Wayne, IN, Attorneys for Appellant/Cross Appellee.

Nathan S.J. Williams, Shambaugh, Kast, Beck & Williams, LLP, Fort Wayne, IN, Attorney for Appellees/Cross–Appellants.

## OPINION

BROWN, Judge.

Coldwell Banker Roth Wehrly Graber ("Coldwell") appeals the trial court's grant of its own motion to correct error and raises three issues, which we revise and restate as:

 I. Whether the trial court erred by ruling on its own motion to correct error on the basis that it did not timely file its own motion to correct error;

 II. Whether the trial court had jurisdiction to grant its own motion to correct error; and

 III. Whether the trial court abused its discretion by ordering a new trial.

On cross-appeal, Laub Brothers Oil Company, Inc. ("Laub Brothers"), Douglas Laub, and Gary Laub (collectively, the "Defendants") raise four issues, which we consolidate and restate as:

 I. Whether the trial court erred in denying the Defendants' motion for summary judgment; and

 II. Whether the trial court erred in denying the Defendants' motion for judgment on the evidence.

We affirm.

This case concerns whether Coldwell is entitled to a commission based upon a sale of property by Laub Brothers to Stonestreet & Stonestreet Oil Co., Inc. ("S & S Oil"). Because this case involves both issues of summary judgment and judgment on the evidence, we will initially recite the facts supported by both the designated evidence and the evidence presented at trial.

In 2004, Michael Curtner, a sales agent with Coldwell, made a cold call on Laub Brothers and met with Doug Laub and Gary Laub. On April 19, 2004, Curtner met with S & S Oil, explained to them that he was a commercial agent and wanted to discuss the possibility of working with them on properties that may be of interest to S & S Oil but did not discuss anything with S & S Oil regarding Laub Brothers. S & S Oil indicated that they wanted to talk to Curtner. Jerry Kohart, a sales agent who worked for Coldwell as a buyer's agent and had a standing agency relationship with S & S Oil, "chew[ed] [Curtner] out for contacting [S & S] Oil." Appellees'/Cross–Appellants' Appendix at 193.[1]

---

1. On October 13, 2010, this court issued an order designating Coldwell as the Appel-

On May 12, 2004, Coldwell and Laub Brothers entered into a "Listing Contract" which provided Coldwell with an exclusive right to sell seven of Laub Brothers' properties. The Listing Contract was originally to run from May 12, 2004 through November 12, 2004 but was subsequently extended by the parties such that the term ended May 12, 2005. The Listing Contract identified Curtner as the salesperson/agent. The Listing Contract contained the following:

> 7. **COMMISSION PROTECTION:** Within 360 days after the Term, as it may be extended if the property is: (i) sold, exchanged or optioned; (ii) contracted to be sold, exchanged or optioned; (iii) subject to the commencement of, resumed or continued negotiations to be sold, exchanged or optioned to anyone with whom Broker, Seller or any of their agents or employees had negotiations during the Term and who was identified on a list submitted to Seller within 30 days after expiration of the Term, then Seller agrees to pay Broker a commission on sale, exchange or option pursuant to Section B.

Exhibit 1 at 1; Appellees'/Cross–Appellants' Appendix at 171.

During the term of the Listing Contract, Curtner told his manager, Fred Beck, that they needed to contact S & S Oil.[2] Appellees'/Cross–Appellants' Appendix at 192. Beck told Curtner to call Kohart, and Curtner indicated that he did not want to call Kohart. As Curtner sat in Beck's office, Beck called Kohart and gave Kohart the information on each location of Laub Brothers' properties and the prices. Beck asked Kohart to contact S & S Oil. Curtner could not hear what Kohart said but heard Beck state: "If you need any other information, be sure and contact me." *Id.* Curtner did not discuss with Kohart or see any documentation regarding whether Kohart had passed the information on from Beck to S & S Oil. About a month later, Curtner went to Beck and said: "Hey, call Jerry Kohart. See what [S & S] Oil's doing." *Id.* Beck told Curtner that he would call Kohart, and later told Curtner that he had asked Kohart if S & S Oil was interested in purchasing Laub Brothers' properties and that Kohart stated: "They haven't decided." *Id.* Two or three days before the expiration of the term of the Listing Contract, Curtner called Kohart and left a voicemail for him.

Curtner prepared a letter dated June 6, 2005 listing several individuals and companies that Coldwell claimed to have contacted during the term of the Listing Contract. The document listed S & S Oil. On August 6, 2005, Laub Brothers and S & S Oil entered into a purchase agreement regarding the sale of six of the properties referenced in the Listing Contract.

In a letter dated November 10, 2006, Gary Laub wrote to Coldwell's attorney stating that it was in response to a letter dated October 26, 2006.[3] The November 2006 letter stated in part:

---

lant/Cross–Appellee and Laub Brothers Oil as the Appellee/Cross–Appellant.

**2.** Laub Brothers' memorandum in support of its motion for summary judgment states: "In November, 2004, Curtner approached his boss, Fred Beck ("Beck") about contacting [S & S Oil]." Appellees'/Cross–Appellants' Appendix at 241 (citing "Curtner Depo., 30:15–31:1"). Our review of 30:15 to 31:1 of Curt-

ner's deposition does not reveal a date that Curtner spoke with Beck.

**3.** The designated evidence related to the summary judgment does not contain a letter dated October 26, 2006. At trial, a letter dated August 31, 2006, was admitted that was written by Charles Davis indicating that he was representing Coldwell. This letter referenced the "properties listed by Laub Bros. Oil and

After two six month listings of our stores (with no results), the listing ran out.

Months passed, then Jerry Kohart and Yancy Stonestreet (with S & S Oil in Auburn) contacted us about possibly purchasing some of our stores. Yancy did purchase five of the six. Mike Curtner had no contact or anything to do with S & S Oil.

*Id.* at 281; Exhibit 5.

On January 23, 2008, Coldwell filed a complaint against the Defendants alleging that they wrongfully refused to pay Coldwell a commission. The complaint asked for damages "in the amount of six percent (6%) of Defendants' total sale price of its properties to [S & S Oil] or $102,000.00 whichever is greater plus attorney fees, costs, pre and post judgment interest, and all other just and proper relief." Appellees'/Cross–Appellants' Appendix at 169.

On January 30, 2008, the Defendants filed an answer to Coldwell's complaint and demanded a jury trial. On February 19, 2008, the Defendants moved for summary judgment. The Defendants argued that Coldwell did not participate in anything amounting to "negotiations" on behalf of the Defendants and was not entitled to a commission. *Id.* at 247. The Defendants also pointed out that the Listing Contract used the following phrases: "Market," "Disclose to the buyer information," and "Procure[ ] a written offer." *Id.* at 244. The Defendants argued that "the term 'negotiations', as used in the Listing Contract, is something different that [sic] simply marketing the property or disclosing information to a prospective buyer." *Id.* at 245.

In response, Coldwell argued that Laub Brothers "presumes that the parties intended a definition of 'negotiations' pulled from a 50 year old version of Black's Law Dictionary when they entered into the Listing Contract." *Id.* at 252. Coldwell argued that even presuming that this is the definition the parties intended, the definition of negotiations "includes the 'discussion ... upon the terms of a proposed agreement." *Id.* (quoting BLACK'S LAW DICTIONARY 1188 (4th ed.1957)). Coldwell argued that "[t]he evidence indicates that Curtner, through Beck, relayed the terms of the agreement to Jerry Kohart (location, price), who was an agent of S & S Oil." *Id.* Coldwell also pointed out that "[w]hen Beck followed up with Jerry Kohart, he was told that S & S was still undecided, the only reasonable inference being that the offer was being considered." *Id.*

On June 10, 2008, the court denied the Defendants' motion for summary judgment. Specifically, the court stated:

[Coldwell] has designated evidence showing that some form of discussion and deliberation occurred between [Coldwell] and [S & S Oil]. It is undisputed that [Coldwell] contacted [S & S Oil] and gave them information. [Coldwell] argues that it had discussions with [S & S Oil] regarding Defendants' properties, the terms were conveyed and considered, and ultimately a sale did not happen. [Coldwell] contends that this process creates a genuine issue as to whether negotiations took place.

It is not clear under the terms of the contract whether the discussion and deliberation that occurred between [Coldwell] and [S & S Oil] rises to the level of negotiation, as there is no bright line

shown by Mike Curtner" and stated: "It has come to our attention that most of these properties may have been sold to companies that were contacted by Mike Curtner, but there have been no commissions to Coldwell Banker." Exhibit 5.

identifying when negotiations have taken place. It is undisputed that discussion between [Coldwell] and [S & S Oil] did occur, and the Court believes reasonable persons could disagree over whether those discussions were negotiations under the Listing Agreement. . . .

This Court must resolve any doubts as to facts or inferences in favor of the non-moving party. [Coldwell] has designated evidence to show that discussions did occur. Whether or not these discussions rose to the level of negotiations is not clear. Reasonable persons may differ in deciding whether the discussions that took place between [Coldwell] and [S & S Oil] were negotiations. Whether those discussions were negotiations is a material fact to the disposition of the matter.

*Id.* at 71–72.

On June 12, 2008, the court granted a motion to dismiss the individual defendants of Douglas Laub and Gary Laub. On July 15, 2009, Coldwell filed an amended complaint which listed Laub Brothers, Douglas Laub, Gary Laub, Jody Laub, and Marilyn Miller as defendants. Jody Laub and Marilyn Miller were subsequently dismissed as defendants.

The case was submitted to a jury on September 22 and 23, 2009. On September 23, 2009, the Defendants filed a motion for judgment on the evidence, which the court denied. The jury found for Coldwell and awarded it $102,000.

On October 6, 2009, Coldwell filed a motion for the court to enter final judgment. On October 21, 2009, the Defendants filed a motion to correct error requesting the trial court to enter judgment in favor of the Defendants pursuant to Ind. Trial Rule 59(J)(7) or find that the jury's verdict was excessive pursuant to Ind. Trial Rule 59(J)(5). The Defendants argued that the court should construe the phrase "had negotiations" to mean "deliberation and communications which are multilateral in nature, and some level of discussion back and forth or bargaining between parties." *Id.* at 141. The Defendants argued that the court should find that there was no evidence that Coldwell had negotiations with S & S Oil. The Defendants also argued that the jury's award of damages was excessive. Coldwell filed a response to the Defendants' motion to correct error.

On November 17, 2009, the court entered a final judgment awarding Coldwell $102,000 pursuant to the jury award, $33,087.12 in interest, and $51,206.90 in attorney fees.[4]

---

4. Without citation to the record, Coldwell's statement of the case indicates that it "later amended its Complaint to name Gary and Douglas, as well as Jodi Laub and Marilyn Miller—other shareholders in the corporate defendant, Laub Brother Oil Company, Inc.— as defendants. Each of the individual shareholders was subsequently dismissed as a defendant, such that the trial proceeded in this case, only against the corporate defendant." Appellant's/Cross–Appellee's Brief at 1–2 n. 1. The Defendants agree with Coldwell's statement of the case. The court's November 17, 2009 order stated:

[Coldwell] made a claim for breach of contract against the Defendant Laub Brothers Oil Company, Inc., the parties having stipulated that Defendants Gary Laub and Douglas Laub would be jointly and severally liable to satisfy any judgment entered against the Defendant Laub Brothers Oil Company, Inc. The case caption on those matters submitted to the Jury and in all references in the Instructions dealt only with Defendant Laub Brothers Oil Company, Inc. This was done so that the Jury was not confused by a variety of Defendants.

\* \* \* \* \* \*

Defendants Douglas Laub and Gary Laub are jointly and severally liable for this judgment entry as well.

Appellees'/Cross–Appellants' Appendix at 13–14.

On December 16, 2009, the court held a hearing on the Defendants' motion to correct error, and the parties agreed that the time for ruling on the motion to correct error would not begin until two weeks from December 17, 2009, or December 31, 2009. On January 29, 2010, the court filed an Application for Extension of Time for Ruling on Motion to Correct Error Pursuant to Trial Rule 53.3(D) with the Indiana Supreme Court. The court's application stated in part:

> The case involved the construction of the term "had negotiations" in the context of a dispute over a real estate commission. Counsel for both parties advised the Court that there was no Indiana case law on point. The Court, however, recently found a case that is controlling under Indiana Law, and, had that case been found during the course of this litigation, it would have, at the very least, changed permissible testimony at the Jury Trial and would have materially and substantially changed instructions to the Jury.
>
> \* \* \* \* \* \*
>
> The Court has made great progress in this review and has worked diligently over weekends, evenings and between numerous hearings in an effort to finish its review within the time constraints of Trial Rule 53.3.
>
> The Court would add that there may be other issues to review before the Court can properly issue its Order on the Motion to Correct Error filed by the Defendants.

*Id.* at 79–80. The court requested "an additional thirty (30) days which would commence running from Monday, February 1, 2010 until Tuesday, March 2, 2010." *Id.* at 80.

On February 11, 2010, the trial court entered a forty-three page Order or Judgment of the Court on Court's Own Motion to Correct Error and Correcting Error. The court stated that it "must adhere to the holding of" *Barrick Realty Co. v. Bogan,* 422 N.E.2d 1306, 1307 (Ind.Ct.App. 1981), which the court interpreted as requiring the court "to construe the words 'had negotiations' to mean more than a mere 'showing' of the property, more than 'discussions' or more than 'the providing of information about the property.'" *Id.* at 29. The court stated that the jury had been improperly instructed because no instruction defined the phrase "had negotiations." *Id.* at 50.

The court ordered that "the Defendants' Motion to Correct Error under Trial Rule 59(J)(7) and Trial Rule 59(J)(5) is moot, but that the court, on its own motion, sets this matter for a new trial pursuant to Trial Rule 59(J)(1) and other pertinent provisions of Trial Rule 59(J)." *Id.* at 56. The court ordered that "[Coldwell] shall be entitled to a new jury trial on the issue of whether the listing agent, under the Listing Contract, or the Defendants, 'had negotiations' during the term of the contract." *Id.* On February 19, 2010, the Indiana Supreme Court granted the court's request pursuant to Ind. Trial Rule 53.3(D). The Court's order stated: "It is, therefore, ordered that the Hon. Daniel G. Heath is granted an extension of time through March 2, 2010, to enter a ruling on the motion to correct error pending in the above matter." Docket 02–S–00–1002–SJ–77.

On March 1, 2010, the Defendants filed a notice of appeal with respect to the June 10, 2008 order denying their motion for summary judgment, the September 23, 2009 order denying their motion for judgment on the evidence, the November 17, 2009 order entering judgment in favor of Coldwell, and the "deemed denial of [the Defendants'] Motion to Correct Error, as of February 1, 2010." *See* Appel-

lees'/Cross–Appellants' Notice of Appeal. On March 10, 2010, Coldwell filed a notice of appeal of the court's February 11, 2010 order for a new trial.

We begin by addressing the issues raised by the Defendants on cross-appeal because, if they have merit, they would be dispositive.

## I.

The first issue is whether the trial court erred in denying the Defendants' motion for summary judgment. Our standard of review for a trial court's denial of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Id.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox Cnty.*, 779 N.E.2d 1, 3 (Ind.2002).

The Defendants argue that "the difference of opinion whether the discussions between Coldwell Banker & [S & S Oil] were 'negotiations' is not a factual issue." Appellees'/Cross–Appellants' Brief at 21. The Defendants argue that "[w]hat constitutes 'negotiations' is a *question of law* for the Court to determine in construing the Listing Contract." *Id.* The Defendants also argue that "[t]here was no evidence of the conduct of Coldwell Banker's agents—relative to the question of whether negotiations occurred with [S & S Oil]—in the

Complaint, the Answer or the deposition of Douglas Laub." *Id.* at 23.

Coldwell argues "if the term is ambiguous, it is clear that the meaning of 'negotiations' is a fact sensitive question." Appellant/Cross–Appellee Reply Brief at 12. Coldwell also argues that "viewing all facts and inferences in favor of Coldwell, and taking the Motion as framed by Laub Brothers, there was a genuine issue of material fact as to whether these discussions constituted 'negotiations' under the Listing Contract." *Id.* at 15.

 This case requires us to interpret the Listing Contract. "Interpretation of a contract is a pure question of law and is reviewed de novo." *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005). If its terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Id.* Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* "We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Rogers v. Lockard*, 767 N.E.2d 982, 992 (Ind.Ct.App.2002). "Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations." *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind.2010). "When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the fact-finder." *Id.*

"Negotiations" is defined generally as "[t]he act or process of negotiating." American Heritage Dictionary of the English Language 1176 (2006). "Negotiate" is defined generally as "[t]o confer with another or others in order to come to terms or reach an agreement." *Id.* "Negotiation" is also defined as "[a] consensual bargaining process in which the parties

..

attempt to reach agreement on a disputed or potentially disputed matter" and "[d]ealings conducted between two or more parties for the purpose of reaching an understanding." BLACK'S LAW DICTIONARY 1064–1065 (8th ed.2004). This court has also observed that an earlier version of "Black's Law Dictionary defines 'negotiate' as '[t]o communicate with another party for the purpose of reaching an understanding ... [or] [t]o bring about by discussion or bargaining.'" *Stewart v. Randolph Cnty. Office of Family & Children,* 804 N.E.2d 1207, 1211 (Ind.Ct.App.2004) (quoting BLACK'S LAW DICTIONARY 1059 (7th ed.1999)), *trans. denied.* In discussing the term "negotiated" within a broker agreement, the Wisconsin Supreme Court held that "the word *'negotiated'* means that the efforts of the broker to interest a prospect must have proceeded to the point where the prospect would be considered a *likely* purchaser." *Munson v. Furrer,* 261 Wis. 634, 53 N.W.2d 697, 699 (1952). *See also* 12 C.J.S. Brokers § 209 ("[T]he term 'negotiation' within the meaning of such a contractual provision means efforts which so far interest a person that, at the expiration of the agency, the person may be considered a likely buyer, and it does not embrace the broker's mere offer to sell which is met with a prompt refusal and which has no effect on the subsequent sale.").

The designated evidence reveals that Beck, Curtner's manager, called Kohart, S & S Oil's agent, and gave Kohart information on each location of Laub Brothers' properties and the prices and asked Kohart to contact S & S Oil. Sometime later, Beck called Kohart at Curtner's request and asked if S & S Oil was interested in purchasing Laub Brothers' properties, and Kohart indicated that S & S Oil had not decided. Two or three days before the expiration of the term of the Listing Contract, Curtner called Kohart and left a voicemail for him. Less than three months after the Listing Contract expired and well within the 360 day time period mentioned in the Commission Protection clause, Laub Brothers and S & S Oil entered into a purchase agreement regarding most of the properties in the Listing Contract. The Defendants did not designate any evidence suggesting that S & S Oil promptly refused or rejected Coldwell's communications or otherwise indicated that S & S Oil was not interested in the properties.

■ Based upon the designated evidence and construing all facts and reasonable inferences drawn from those facts in favor of the nonmovant, we cannot say that there are no issues of material fact with respect to whether Coldwell engaged in negotiations with S & S Oil. Accordingly, we conclude that the trial court did not err in denying the Defendants' motion for summary judgment.[5] *See First Fed. Sav.*

5. The Defendants point to the fact that the Listing Contract included the term "Disclose to the buyer information." Specifically, the Defendants point to Section 2 of Paragraph F, which is entitled "Agency Disclosures" and states:

Agency Relationships. I.C. 25–34.1–10–9.5 provides that a Licensee has an agency relationship with, and is representing the individual with whom the Licensee is working unless (1) there is a written agreement to the contrary; or (2) the Licensee is merely assisting the individual as a customer. Li-

censee (Broker) represents the interests of the Seller as Seller's agent to sell the Property. Licensee owes duties of trust, loyalty, confidentiality, accounting and disclosure to the Seller. However, Licensee must deal honestly with a buyer and disclose to the buyer information about the Property, including all latent and patent defects in the Property, whether or not Seller believes they are minor or major in nature, and whether or not they are now known or are discovered in the future.

*Bank of Ind. v. Galvin*, 616 N.E.2d 1048, 1054 (Ind.Ct.App.1993) (holding that whether an individual acted as a broker by participating in negotiations was a question of fact to be answered by a jury), *trans. denied*; *Munson*, 53 N.W.2d at 699 (holding that ordinarily determining whether the efforts of the broker to interest a prospect proceeded to the point where the prospect would be considered a likely purchaser was a question of fact for determination by the jury).[6]

## II.

■ The next issue is whether the court erred in denying the Defendants' motion for judgment on the evidence. Ind. Trial Rule 50 states that a motion for judgment on the evidence should be granted "[w]here all or some of the issues in a case tried before a jury ... are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it." Ind. Trial Rule 50(A). The Indiana Supreme Court has held that "[a] motion for judgment on the evidence should be granted 'only when there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim.'" *Raess v. Doescher*, 883 N.E.2d 790, 794 (Ind.2008) (quoting *Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806, 810 (Ind.Ct.App.1991), *trans. denied*), *reh'g denied*. Upon appellate review of a trial court's ruling on such a motion, the reviewing court "must consider only the

Appellees'/Cross–Appellants' Appendix at 172. We cannot say that the use of the phrase "disclose to the buyer information" within this clause impacts our interpretation of "negotiations" in the Commission Protection Clause.

6. The parties disagree as to the relevance of *Barrick Realty Co. v. Bogan*, 422 N.E.2d 1306, 1307 (Ind.Ct.App.1981). In *Barrick*, an exclusive listing on a hotel included an extension clause which stated that the seller would pay a commission if the property was sold within six months after the term of the agreement to anyone that the agent "*had negotiations* relative to the purchase of said property for said price...." *Barrick*, 422 N.E.2d at 1307. The trial court concluded that no negotiations occurred and that the realty company and agent were not entitled to a commission from a sale that occurred during the extension period. *Id*. On appeal, the court observed that the agent and realty company were appealing a negative judgment and that they must demonstrate that the judgment of the trial court is contrary to law. *Id*. In response to the agent's argument that the finding of the trial court that discussions took place but that negotiations did not were inconsistent, the court held:

This is not necessarily so. Depending upon the construction given the term negotiations, "discussions" may or may not be negotiations. Granted, negotiations are something less than an actual sale. Negotiations could reasonably be construed to be more than discussions or the providing of certain information needed to negotiate. Here, the trial court required less than a sale, but more than discussion. It could have reasonably construed the agreement to require discussion whereby parties mutually interested seek to resolve differences with the purpose of arriving at agreement. This definition of negotiations serves as a reasonable basis for the trial court to require more than what occurred here, given the broadness of the term and its admittedly ambiguous nature.

\* \* \* \* \* \*

While we might not have construed the agreement with the same results as the trial court, the decision of the trial court is not unreasonable. Applying the "accepted rules of construction" as requested by appellant, we cannot say the trial court's decision was contrary to law.

*Id*. at 1308–1309.

We cannot say that *Barrick* stands for a specific definition of the word "negotiations" given that the court stated: "While we might not have construed the agreement with the same results as the trial court, the decision of the trial court is not unreasonable." *Id*. at 1309.

evidence and reasonable inferences most favorable to the nonmoving party." *Id.* at 793–794 (quoting *Sipes v. Osmose Wood Preserving Co. of Am., Inc.,* 546 N.E.2d 1223, 1224 (Ind.1989)).

The Defendants argue that "[t]he evidence presented at trial did not differ in any significant manner from that which was designated before the Trial Court at the Summary Judgment stage." Appellee/Cross–Appellant's Brief at 27. The Defendants argue that "[t]here is no evidence presented that Kohart ever passed the information along to [S & S] Oil, or even discussed it with them" or "that Kohart ever responded in any substantive way to Fred Beck or to Michael Curtner." *Id.* at 28. The Defendants argue that "[t]here is absolutely no evidence of anything which would rise to the level of 'dialogue', 'adjustment or resolution of differences in order to strike a bargain', or anything beyond the mere unilateral provision of information from one party to another." *Id.*

Coldwell argues that "[f]or the same reason the Trial Court properly denied Laub's Motion for Summary Judgment, there was evidence from which the jury could have concluded that Coldwell and S & S 'had negotiations.'" Appellant/Cross–Appellee Reply Brief at 15. Coldwell also argues that "there was testimony that was elicited that [S & S Oil] and Laub had discussions, during the term of the Listing Contract, regarding not only the sale but an asking price and an offer price." *Id.* at 16–17. Coldwell also argues that the Defendants "could not bypass its agent" pursuant to the Seller's Covenants clause of the Listing Contract. *Id.* at 17.

In addition to the admission of the depositions that were designated for purposes of summary judgment, at trial Beck testified that he told Kohart that the property was for sale and that he probably discussed the specific properties and specific prices with Kohart. Bob Coffee, the president of the Fort Wayne area Multiple Listing Service and a past president of the Fort Wayne Area Association of Realtors, testified that Kohart as S & S Oil's agent had "every responsibility" to pass information to S & S Oil. Trial Transcript at 172. John Bellio, the president of Coldwell, testified that negotiations would probably take six months on a complex deal with multiple locations. Yancy Stonestreet, the owner of S & S Oil, testified that he talked with the Laubs about purchasing properties from 2002 through May 12, 2005 and that they talked "maybe every quarter." *Id.* at 130.

Based upon the record, Coldwell presented evidence that disputed the Defendants' contention that it did not negotiate with S & S Oil. Under the circumstances, we cannot say that the evidence presented regarding whether Coldwell negotiated with S & S Oil is without conflict and subject to only one inference that is favorable to the Defendants. Thus, we conclude that the court did not err by denying the Defendants' motion for judgment on the evidence. *See, e.g., Consol. Rail Corp. v. Thomas,* 463 N.E.2d 315, 322 (Ind.Ct. App.1984) (holding that trial court properly denied a motion for a directed verdict).[7]

---

**7.** The Defendants also argue that the trial court erred in denying their motion to correct error on the basis that there was a total absence of evidence from which the jury could infer that Coldwell and the Defendants had negotiations. The Defendants contend that "[t]he analysis of the Trial Court's Ruling on the Motion to Correct Error is virtually the same as the analysis of its ruling on the Motion for Summary Judgment and the Motion for Judgment on the Evidence." Appellees'/Cross–Appellants' Brief at 30. Because we conclude that the court did not err by denying the Defendants' motion for judgment

Because we conclude that the trial court did not err by denying the Defendants' motion for summary judgment or motion for judgment on the evidence, we next turn to the issues raised by Coldwell.

### III.

The first issue raised by Coldwell is whether the trial court erred by ruling on its own motion to correct error on the basis that it did not timely file its own motion to correct error. Ind. Trial Rule 59, which governs motions to correct error provides that "[t]he motion to correct error, if any, may be made by the trial court, or by any party." Ind. Trial Rule 59(B). Ind. Trial Rule 59(C) provides that "[t]he motion to correct error, if any, shall be filed not later than thirty (30) days after the entry of a final judgment or an appealable final order."[8] Ind. Trial Rule 59(E) provides:

> Following the filing of a motion to correct error, a party who opposes the motion may file a statement in opposition to the motion to correct error not later than fifteen [15] days after service of the motion. The statement in opposition may assert grounds which show that the final judgment or appealable final order should remain unchanged, or the statement in opposition may present other grounds which show that the party filing

the statement in opposition is entitled to other relief.

As previously mentioned, the court entered a final judgment on November 17, 2009. On February 11, 2010, the court entered an order finding that "the Defendants' Motion to Correct Error under Trial Rule 59(J)(7) and Trial Rule 59(J)(5) is moot, but that the court, on its own motion, sets this matter for a new trial pursuant to Trial Rule 59(J)(1) and other pertinent provisions of Trial Rule 59(J)." Appellees'/Cross–Appellants' Appendix at 56.

Coldwell argues that "[n]o extension of time was ever sought for the Trial Court to issue its own Motion to Correct Error." Appellant's/Cross–Appellee's Brief at 13–14. Coldwell argues that Ind. Trial Rule 56(C) requires "that a Motion to Correct Error must be filed not later than thirty days after the entry of a final judgment" and that "[t]he Trial Rules set deadlines for Motions to Correct Error and do not differentiate between Motions filed by a party and errors raised by the trial court." Id. at 14. Coldwell argues that the trial court "did not file a Motion to Correct Error or otherwise raise its own error within thirty (30) days of that date as clearly required by the Trial Rules."[9] Id. at 15.

---

on the evidence, we also conclude that the trial court did not err by not granting the Defendants' motion to correct error. *See Bd. of Comm'rs of Delaware Cnty. v. Briggs,* 167 Ind.App. 96, 128–129, 337 N.E.2d 852, 872–873 (1975) (holding that "[t]he test to determine whether a Rule T.R. 50 motion for judgment on the evidence should be granted is the same test that is applied to determine whether a Rule T.R. 59(E) motion should be granted after a verdict has been rendered and a motion to correct errors has been filed," and that "this court need only determine that the judgment below is supported by sufficient evidence as to each element of the cause of action. When this test is satisfied, we can

affirm the trial court's findings as to both the Rule T.R. 50 error and the Rule T.R. 59 error raised in the motion to correct errors."), *reh'g denied.*

8. Ind. Trial Rule 59(C) was subsequently amended effective January 1, 2011 and substituted "is noted in the Chronological Case Summary" for "or an appealable final order."

9. Coldwell cites *Holiday Park Realty Corp. v. Gateway Corp.,* 259 Ind. 477, 289 N.E.2d 292 (1972); and *Haggard v. Hayden,* 494 N.E.2d 338 (Ind.Ct.App.1986), *reh'g denied, trans. denied.* In *Holiday Park,* the trial court issued an order in favor of Holiday Park Realty

The Defendants concede that "[t]here is ... no dispute that the Trial Court did not file a separate motion." Appellees'/Cross–Appellant's Brief at 3. The Defendants argue that nothing in Ind. Trial Rule 59(B) nor any other portion of Trial Rule 59 "explicitly requires the trial court to file a separate motion." [10] *Id.*

■ While the trial court did not file a motion to correct error or explicitly inform the parties that it was considering the definition of negotiations, we observe that the Defendants' motion to correct error, which was filed timely, and Coldwell's response, and the court's February 11, 2010 order focused on the definition of the term "negotiations." Coldwell's response also recognized that one of the options available to the trial court was to grant a new trial. Under the circumstances, we cannot say that the trial court erred in granting its own motion to correct error on this basis.[11]

Corporation ("Holiday") on January 15, 1970. 259 Ind. at 478, 289 N.E.2d at 293. The next day the court, on its own motion, vacated the judgment of the previous day and scheduled a date for completion of evidence and final argument. *Id.* On June 8, 1971, the court entered judgment against Holiday. *Id.* at 479, 289 N.E.2d at 293. On appeal, Holiday argued that the trial court erred in setting aside the judgment of January 15, 1970 because no written reasons were assigned. *Id.* We observed that Holiday specified in its motion to correct errors that no notice was given by the court when it set aside the January 15, 1970 judgment but that "no argument on the notice question was presented by Holiday in its brief and is therefore waived." *Id.* Because the court did not address Holiday's argument regarding notice, we do not find *Holiday Park* instructive.

In *Haggard*, we concluded that the trial court erred in granting a new trial on damages on its own motion because it failed to provide a statement of facts supporting its conclusion of error as required by Ind. Trial Rule 59(D). 494 N.E.2d at 341. Because the court did not address whether a trial court is required to file a motion to correct error prior to ruling, we do not find *Haggard* instructive.

10. Defendants cite *Lake Mortg. Co., Inc. v. Fed. Nat'l Mortg. Ass'n*, 262 Ind. 601, 607, 321 N.E.2d 556, 560 (1975), in which the Court held that "[w]hile a trial court may grant relief upon its own motion for any of the error specified in T.R. 59(A)(1–9) 'without limitation,' in so doing it must support the error with '... a statement of the facts and grounds upon which the errors are based,' as required by T.R. 59(B)." The Court's reference to "without limitation" is from Ind. Trial Rule 59(A), which stated: "The court upon its own motion or the motion of any of the par-

ties for or against all or any of the parties and upon all or part of the issues shall enter an order for the correction of errors occurring prior to the filing thereof, including, without limitation, the following...." The Court did not explicitly address whether a trial court is required to file a motion to correct error. Accordingly, we do not find *Lake Mortg.* instructive.

11. We observe that Judge Sullivan commented on Ind. Trial Rule 59(B) which states that "[t]he motion to correct error, if any, may be made by the trial court, or by any party," and Ind. Trial Rule 59(D) which governs the content of a motion to correct error. Specifically, Judge Sullivan stated:

I think T.R. 59(D) in conjunction with T.R. 59(B) would appear to be somewhat inconsistent with T.R. 59(J). In construing T.R. 59 in its entirety, I believe the only logical application of T.R. 59(D) is to limit it to a Motion to Correct Errors filed by one of the litigants challenging the verdict or the trial court's judgment or ruling and that it is not applicable to a "Motion" to Correct Errors "filed" by the trial court itself.

*In re R.S.*, 774 N.E.2d 927, 932 (Ind.Ct.App. 2002) (Sullivan, J., concurring) (footnote omitted), *trans. denied.* Judge Sullivan also noted:

To be sure, if the trial court itself initiates the "Motion to Correct Errors," the party who would be aggrieved by such error correction is entitled to notice of the trial court's change of position and is entitled to be heard on the matter. However, I cannot conceive that the trial court under T.R. 59(B) is required to prepare a formal motion and to file it with the Clerk of Court rather than merely to enter an order advising the parties of the court's proposed or intended action.

## IV.

The next issue is whether the trial court had jurisdiction to grant its own motion to correct error. Ind. Trial Rule 53.3 governs the time limitation for ruling on a motion to correct error. Ind. Trial Rule 53.3(D) governs extensions of time for ruling, which at the time of the trial court's application for an extension provided: [12]

> The Judge before whom a Motion to Correct Error is pending may extend the time limitation for ruling for a period of no more than thirty (30) days by filing an entry in the cause advising all parties of the extension. Such entry must be in writing, must be filed before the expiration of the initial time period for ruling set forth under Section (A), and must be served on all parties. Additional extension of time may be granted only upon application to the Supreme Court as set forth in Trial Rule 53.1(D).

Ind. Trial Rule 53.1(D) provides:

> A judge may apply to the Supreme Court of Indiana to extend the time limitation set forth under Trial Rule 53.1, 53.2, or 53.3. The application must be filed prior to the filing of a praecipe with the Clerk under Trial Rules 53.1, 53.2, or 53.3, must be verified, must be served on the Clerk and all parties of record, and must set forth the following information:
>
> > (1) The nature of the matter under submission;
> >
> > (2) The circumstances warranting the delay; and
> >
> > (3) The additional time requested.
>
> The withdrawal of submission under Trial Rule 53.1 or 53.2 or denial of a motion to correct error under Trial Rule 53.3

may not take effect during the pendency of the application for an extension of time to rule. However, if the time limitation expires while the application is pending before the Supreme Court, the jurisdiction of the trial judge shall be suspended at that point pending the action of the Supreme Court.

Coldwell cites to Trial Rule 53.1(D) and argues that the "Trial Rules expressly provide that 'the jurisdiction of the trial judge is suspended at that point pending action of [the Indiana Supreme] Court.'" Appellant's/Cross–Appellee's Brief at 16. Coldwell argues that "[a]s an extra-jurisdictional action, the Trial Court's February 11, 2010 Order should be considered void *ab initio*." *Id.*

The Defendants argue that Coldwell's argument is "the height of exalting form over substance." Appellees'/Cross–Appellants' Brief at 7. The Defendants argue that "[t]here is nothing in the Trial Rules which addresses the status of an order such as the February 11, 2010, Order Correcting Error on such facts." *Id.* at 9. The Defendants argue that "[t]his Court should not read the term 'suspended' in Trial Rule 53.1(D) to mean that jurisdiction is 'terminated.'" *Id.* The Defendants also argue that "this Court should interpret the term 'suspended' to mean that jurisdiction is retroactively restored to a trial court in a situation such as this, where the Supreme Court grants the application for extension of time." *Id.*

In its reply brief, Coldwell argues that "[t]he appellate courts of Indiana have not addressed the effect of a 'suspension' of the Trial Court's jurisdiction." Appel-

---

*Id.* at 932 n. 2. Here, both parties had notice and discussed the definition of the term "negotiations" and its impact.

12. Ind. Trial Rule 53.3(D) was subsequently amended effective January 1, 2011. The amended version substituted "noted in the Chronological Case Summary" in subdivision (D) for "filed" in the second sentence.

lant's/Cross–Appellee's Reply Brief at 23. Coldwell argues that the Defendants cite no case law for the proposition that "the jurisdiction to enter the order is retroactively restored and any orders issued during the time the trial court is without jurisdiction magically spring to life." *Id.* Coldwell also suggests that the purpose behind the Rule and the suspension of the trial court's jurisdiction is to avoid confusion as to when a notice of appeal is required.

■ The record reveals that the trial court issued its February 11, 2010 order prior to the Supreme Court's order granting the trial court's application for extension of time. However, we observe that the trial court's application requested "an additional thirty (30) days which *would commence* running from Monday, February 1, 2010 until Tuesday, March 2, 2010," Appellees'/Cross–Appellants' Appendix at 80 (emphasis added), and that the Supreme Court's order stated that "said request should be granted pursuant to Ind. Trial Rule 53.3(D)." Docket 02–S–00–1002–SJ–77. The Court's order also stated: "It is, therefore, ordered that the Hon. Daniel G. Heath is granted an extension of time through March 2, 2010, to enter a ruling on the motion to correct error pending in the above matter." *Id.* Under these circumstances, we decline to hold that the trial court's February 11, 2010 order is void under Ind. Trial Rule 53.1(D).

### V.

The next issue is whether the trial court abused its discretion by ordering a new trial. Coldwell argues that the trial court abused its discretion by ordering a new trial because it misapplied *Barrick* and other cases. Coldwell argues that the issue of whether there were negotiations was properly decided by the trier of fact. Coldwell also argues that "[a] jury is impaneled to exercise their commonsense and every day experience, not to issue verdicts that are consistent with Black's Law Dictionary." Appellant's/Cross–Appellee's Brief at 28.

The Defendants argue that "[t]he Trial Court's construction of the term 'negotiations'—requiring something more than the mere unilateral provision of information to a prospective buyer—is proper." Appellees'/Cross–Appellants' Brief at 11. The Defendants also argue that "the relief granted by the Trial Court—a new trial—is within the scope of remedies given to the Trial Court at Indiana Trial Rule 59(J). . . ." *Id.*

■ "Indiana courts have the inherent power to grant new trials *sua sponte* and are expressly authorized to do so by [Indiana] Trial Rule 59(B)." *Dughaish ex rel. Dughaish v. Cobb,* 729 N.E.2d 159, 169 (Ind.Ct.App.2000), *reh'g denied, trans. denied.* "When a trial court raises a motion to correct error *sua sponte,* a new trial may be granted if it is determined that prejudicial or harmful error has been committed." *Kempf Contracting and Design, Inc. v. Holland–Tucker,* 892 N.E.2d 672, 676 (Ind.Ct.App.2008) (citing Ind. Trial Rule 59(J)), *trans. denied.* Ind. Trial Rule 59(J) provides that "[t]he court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors: (1) Grant a new trial; . . . ." As a general matter, a decision to grant a new trial is reviewed for an abuse of discretion, and the trial court's decision is given a strong presumption of correctness.[13]

---

13. "The strong presumption of correctness only arises if the court's decision is supported by the special findings required by Trial Rule 59(J)." *Walker,* 943 N.E.2d at 352. Here, the

*Walker v. Pullen,* 943 N.E.2d 349, 351 (Ind.2011).

The trial court initially instructed the jury as follows:

A condition precedent in this case is that the Plaintiff must have "had negotiations" on behalf of the Defendant with a third party to whom the Defendant ultimately sold its property. A contract term is "ambiguous" if a reasonable person could find that its terms are susceptible to more than one interpretation. If you find that the term "negotiations" as used in the parties' contract is ambiguous, then you should construe the contract to determine the intent of the parties. If the term "negotiations" is not ambiguous, then you should use the plain and ordinary meaning of said term. If you find that the contract is ambiguous and that you must construe the contract to determine the intent of the parties, you should follow certain rules of construction: A) you should look first to the language of the contract, found within the "four corners" of the document, to determine the intent of the parties; B) you should read the contract as a whole, and consider all of the terms of the contract; C) you should construe the contract against the party who drafted it; D) the expression of one thing in a contract implies the exclusion of another; E) you should presume that all provisions in a contract are there for a purpose, and seemingly conflicting provisions should be reconciled to give effect to all provisions; F) the contract should not be construed in a way that would render any words, phrases, or terms ineffective or meaningless; G) if you cannot construe the meaning of the term "negotiation" within the "four cor-

ners" of the document, or under the rules of contract construction set forth above, then you may consider evidence extrinsic to the document. If you find that the Plaintiff did not prove that it had "negotiations" as contemplated by the parties' agreement, then you should find that the Plaintiff failed to satisfy a condition precedent, and enter judgment in favor of the Defendant.

Transcript at 439–441.

In its February 11, 2010 order granting its own motion to correct error, the court stated that the jury "was not instructed at all on the key term at issue...." Appellees'/Cross–Appellants' Appendix at 42. The court set the matter for a new trial "in which the jury will be properly instructed on what the term 'had negotiations' means...." Appellees'/Cross–Appellants' Appendix at 55. To the extent that the court stated that it "must adhere to the holding of" *Barrick Realty Co. v. Bogan,* 422 N.E.2d 1306 (Ind. Ct.App.1981), we noted earlier that *Barrick* is not instructive. Thus, while we disagree with the trial court's reliance on *Barrick,* we agree that the jury was not instructed on the proper definition of negotiations in this specific context as addressed earlier in Part I and that a new trial is warranted.[14]

For the foregoing reasons, we affirm the trial court's grant of its own motion to correct error and grant of a new trial.

Affirmed.

ROBB, C.J., and RILEY, J., concur.

---

trial court's February 11, 2010 order consisted of forty-three pages and the parties do not argue that the trial court failed to make the special findings required by Trial Rule 59(J).

14. Because we affirm the trial court's order granting a new trial, we do not address the Defendants' arguments that the damages were excessive.