

FILED

Feb 18 2019, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
(FATHER)

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT (MOTHER)

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Parent-Child Relationship of Ma.H., Le.H., Lo.H., W.H., La.H., Me.H., and S.W. (Children) and M.H. (Father) and R.H. (Mother);

M.H (Father) and R.H. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 18, 2019

Court of Appeals Case No. 18A-JT-1296

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Trial Court Cause No.
90C01-1707-JT-22
90C01-1708-JT-29
90C01-1708-JT-30
90C01-1708-JT-31
90C01-1708-JT-32
90C01-1708-JT-34
90C01-1708-JT-35

**May, Judge.**

[1] M.H. ("Father") and R.H. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to Ma.H., Le.H., Lo.H., W.H., La.H., Me.H., and S.W. (collectively, "Children"). Father argues the trial court violated his due process rights when it impermissibly infringed on his constitutional right against self-incrimination under the Fifth Amendment by requiring him to complete sex offender treatment in which he had to admit he molested his step-daughter, R.W., as a condition of reunification with Children.

[2] In addition, Parents argue the trial court's findings did not support its conclusions that: (1) the conditions under which Children were removed from Parents' care would not be remedied; (2) the continuation of the parent/child relationship posed a threat to the well-being of Children; and (3) termination was in Children's best interests.

[3] We conclude the requirement that Father admit molesting R.W. violates Father's Fifth Amendment right against self-incrimination and the trial court's reliance on his refusal to so admit as proof that his parental rights should be terminated violates his Fourteenth Amendment right to due process. Based on these procedural insufficiencies and the lack of sufficient findings to support the trial court's conclusion that termination was in the best interests of Children, we reverse and remand.

# Facts and Procedural History[1]

[4] Mother has two daughters from a previous marriage: R.W., born May 19, 1998, who is not subject to these proceedings,[2] and S.W.,[3] born May 14, 2001.[4] Parents' marriage produced six children: Ma.H., born November 26, 2005; Le.H., born September 8, 2007; Lo.H., born July 6, 2009; W.H., born September 16, 2010; La.H., born February 6, 2013; and Me.H., born September 23, 2014. The facts regarding Children's removal from Parents' care were noted in our earlier opinion affirming Children's adjudication as Children in Need of Services ("CHINS"):

> On March 28, 2016, the Indiana Department of Child Services ("DCS") received a report alleging Father had sexually abused his stepdaughter, R.W., multiple times throughout her childhood. One week prior to the DCS receiving that report, then seventeen-year-old R.W. left home without permission and began residing with her maternal aunt and uncle. R.W. turned eighteen on the same day the DCS began its investigation.
>
> In response to the report and allegations, Wendy Garrett, a DCS Family Case Manager, visited Mother and Father's home. Father answered the door but refused to permit Garrett to enter

---

[1] We held oral argument on November 28, 2018, in the Indiana Court of Appeals Courtroom. We thank counsel for their arguments.

[2] Because R.W. is not a minor, does not reside with Parents, and is not subject to these proceedings, she is not included in Children.

[3] S.W. has cerebral palsy, is unable to communicate verbally, and requires the assistance of a wheelchair.

[4] The father of R.W. and S.W. passed away prior to these proceedings.

the home. Mother and Father refused to cooperate with the investigation at that time.

Following an interview with R.W. concerning her allegations of sexual abuse, the DCS removed the Children from the home and placed them with their maternal aunt and uncle. While removing the Children, Garrett observed the Children had "incredibly poor hygiene" and noted the Children's hair was "matted." Garrett further observed Me.H.'s diaper was "literally falling off, leaking." As to the condition of the home, Garrett described it as "deplorable" and "unsanitary." Garrett observed food, debris, and trash littering the floor of the home, a cluttered kitchen filled with dirty dishes, and piles of soiled clothing throughout the home. Garrett also noted the home did not appear to have a shower or access to water except through a hose brought in from outside the home. There also appeared to be structural issues with the home with portions of the ceiling collapsing over the Children's sleeping space. Garrett was not permitted to view the upstairs area because it "wasn't anything that had been worked on."

On March 31, 2016, the DCS filed verified petitions alleging each child to be a CHINS. The DCS later moved to dismiss the CHINS petition as to R.W. because she reached the age of eighteen. Mother and Father denied the allegations contained in the verified petitions.

On June 10, 2016, the juvenile court held a fact-finding hearing at which R.W. testified concerning her allegations of sexual abuse. R.W. testified the sexual abuse began when she was a young girl. During one instance, R.W. stated Father called her into the bedroom of their home. When she entered the room, he pulled her on top of him and put his hands down her pants. R.W. did not remember how old she was when this incident occurred. During another instance when she was about twelve years old, R.W. awoke on the living room couch and Father was

on top of her. R.W. stated Father's penis touched her vagina. Father told R.W. not to tell anyone or he would do it again. R.W. attempted to speak to Mother about the incident but was too embarrassed to do so. When R.W. was about thirteen years old, Father told R.W. to take water to their horses in the barn and insisted on coming with her. R.W. stated she knew what Father was going to do. In the barn, Father ordered R.W. to lay on a bale of hay and pulled his pants down. Father then inserted his fingers into R.W.'s vagina. Father also inserted his penis into her vagina. R.W. stated the sexual abuse stopped when she was about fifteen or sixteen years old.

R.W. testified she did not believe Father has abused any of her siblings, although she worried it may happen. She also stated that when she lived in the home, she was responsible for helping Mother and Father with the other Children, cleaning the house, and feeding and bathing S.W. R.W. also thought Father punished S.W. with unnecessary force. Occasionally, S.W. would cry uncontrollably and the family struggled to calm her down. Father used to spank her over and over in an attempt to make her stop, but she would not. Mother would cry and tell Father "she's not going to stop crying if [you] just keep[ ] beating her."

On June 11, 2016, the juvenile court issued its order which included its findings of fact and conclusions thereon. The juvenile court found R.W.'s testimony and allegations to be true and adjudicated all seven Children as CHINS. In addition to the sexual abuse of R.W., the juvenile court also found the Children to be CHINS due to the poor condition of the home, the fact Father remained in the home after R.W.'s allegations came to light, and the fact R.W., who provided care and supervision for the Children, was no longer living in the home. The juvenile court ordered the Children to remain in relative placement. On August 18, 2016, the juvenile court held a dispositional hearing at which it adopted the DCS' recommendations to have Mother

and Father participate in services including home based counseling, a parental assessment, random drug screens, and a psychological evaluation. Father was also ordered to complete a substance abuse assessment and sex offender treatment program.

*Matter of La.H.*, 90A02-1609-JC-2135 (Ind. Ct. App., May 31, 2017) (internal citations to the record omitted).

On February 13, 2017, the trial court entered its dispositional decree with a goal of family reunification. The trial court ordered the Children to remain in relative placement with maternal aunt and uncle. The trial court granted Mother supervised visits and Father was denied visitation due to R.W.'s allegations of sexual abuse by Father. In addition, the trial court ordered:

> e. [Parents] shall allow the Family Case Manager or other service provider to make announced or unannounced visits to their home and permit entrance to the home to monitor progress toward compliance with any court order.

> j. [Parents] shall maintain suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities.

> t. [Parents] shall complete a parenting assessment and successfully complete all recommendations developed as a result of the parenting assessment.

> u. [Father] shall complete a substance abuse assessment and follow all treatments [sic] and successfully complete all treatment recommendations developed as a result of the substance abuse assessment.

w. [Parents] shall complete a psychological evaluation as referred and approved by DCS and successfully complete any recommendations that results [sic] from the evaluation.

z. [Parents] shall not commit any acts of domestic violence on anyone including [Children], and agree that if an instance of domestic violence occurs they will immediately report it to the Family Case Manager.

aa. [Father] shall refrain from using any form of physical discipline on [S.W.] while subject to the court's jurisdiction. [Father] shall complete a course of sex offender treatment.

(Father's App. Vol. II at 113-14) (nonsequential lettering in original).

[6] Later in the proceedings, the trial court took under advisement Father's challenges to some of the requirements in the dispositional decree:

The Indiana Department of Child Services requested in its parental participation request that "[Father] will participate in counseling services that will focus on sexual predator discussion due to the CHINS and DCS finding that sexual abuse occurred." The Indiana Department of Child Services requested that [Father] address through counseling his sexual abuse of his step-daughter [R.W.] and its effect on his parenting of [Children]. [Father], through counsel, requests that he not be ordered to participate in sex offender treatment, especially if the treatment requires that [Father] complete a polygraph as a condition of the continuation of counseling. [Father] objects to the counseling first because he denies that he sexually abused [R.W.]. Secondly, [Father] objects to counseling if there is a requirement of completing a polygraph because being ordered to participate in and/or participating in the polygraph waives his right to remain silent as found in the Fifth Amendment to the U.S. Constitution.

> The other area of parental participation that [Father] objects to is the requirement at the present time that he have no contact with [Children]. At the detention hearing on April 1, 2016 and then again at a status hearing on May 5, 2016, because of the allegations that [Father] had been sexually abusing [R.W.] over the course of several years, the allegation that [R.W.] had told [Mother] of the abuse and [Mother] did not protect her, and because there was an on-going criminal investigation in three counties regarding the allegations, the Court ordered that no visitation be implemented for the present time. The Indiana Department of Child Services and [Children's] Guardian ad Litem do not recommend that visitation for [Father] be implemented.

(*Id.* at 80-1.) The trial court's orders regarding sex offender treatment and visitation did not change during the proceedings.

[7] DCS offered Mother home-based services and individual therapy, both of which she successfully completed. However, she refused to believe Father sexually abused R.W. DCS offered Father individual therapy, substance abuse treatment, and sex offender treatment. The sex offender treatment was offered through Phoenix Associates, and it required that Father admit the truth of R.W.'s allegations in order to complete the treatment. Father refused to so admit.

[8] Mother was compliant with all services except those that required her to admit Father sexually abused R.W. Father completed the required assessments, but did not engage in individual therapy and minimally participated in substance abuse treatment, at best. On June 14, 2017, the trial court changed Children's permanency plan from reunification to termination. On July 25, 2017, DCS

filed petitions to terminate Parents' parental rights to Children. The trial court held hearings on the termination petitions on November 15, 21, 22, and 27, 2017.

[9] On May 15, 2018, the trial court entered its order terminating Parents' parental rights to Children. In its order, the trial court made extensive findings regarding Father's refusal to participate in sex offender treatment and his struggles with alcohol, as well as Mother's compliance with services with the exception of admitting that Father molested R.W. Based on those findings, the trial court concluded termination was in the best interests of Children, that the conditions under which Children were removed would not be remedied, and the continuation of the parent-child relationship posed a threat to Children's well-being. Specifically, the trial court concluded:

> 8. [Father] has a history of substantiated sexual abuse of his stepdaughter, failed to complete court-ordered counseling services and sex offender specific treatment, and has refused to admit he has a problem. [. . .]
>
> 9. [R.W.] testified at the CHINS fact-finding on June 10, 2016. [R.W.] testified that she was sexually abused by [Father], on a number of occasions. The Court found [R.W.'s] testimony credible. [. . .]
>
> 10. Mother and [Father] have had two (2) years to accomplish the steps necessary to have the children returned to their care. [. . .]

(*Id*. at 122-3.)

# Discussion and Decision

[10] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[11] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[12] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[13] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98,

102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

### *Father's Fifth Amendment Rights*

[14] The Fifth Amendment to the United States Constitution provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." The Fourteenth Amendment extends this protection to state proceedings. *Bleeke v. Lemmon*, 6 N.E.3d 907, 925 (Ind. 2014) (quoting *Withrow v. Williams*, 507 U.S. 680, 688-9 (1993), *reh'g denied*). "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial . . . but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Id.* (quoting *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984), *reh'g denied*). "The Fifth Amendment prohibits only compelled testimony that is incriminating." *Id.* (quoting *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 190 (2004), *reh'g denied*).

[15] Further,

> a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution.

*Id.* (quoting *Lefkowitz*, 414 U.S. at 78). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 925-6 (quoting *Hoffman v. United States*, 341 U.S. 479, 486-7 (1951)). Answers are incriminating not only when they "would in themselves support a conviction," but also when they would "furnish a link in the chain of evidence" necessary to prosecute a person for a crime. *Id.* at 926 (quoting *Hoffman*, 341 U.S. at 486).

[16] Here, Father was accused of sexually abusing R.W. in several different counties, based on the family's residence at the time of each allegation. All three counties investigated the allegations, with which it is undisputed Father fully cooperated, but ultimately the prosecutors "made the decision not to file criminal charges[.]" (Tr. Vol. II at 128.) Despite the lack of evidence to bring criminal charges, DCS insisted Father complete sex offender treatment, and the trial court agreed. Father objected multiple times to the completion of this requirement. In an order from January 31, 2017, the trial court addressed those concerns:

> [Father], through counsel[,] requests that he not be ordered to participate in the sex offender treatment, especially if the treatment requires that [Father] complete a polygraph as a condition of the continuation of the counseling. [Father] objects to the counseling first because he denies that he sexually abused [R.W.]. Secondly, [Father] objects to counseling if there is a requirement of completing a polygraph because being ordered to

participate in and/or participating in the polygraph waives his right to remain silent as found in the Fifth Amendment to the U.S. Constitution.

The Indiana Department of Child Services requested in its parental participation request as follows: "[Father] will participate in counseling services that will focus on sexual predator discussion due to the CHINS and DCS finding that sexual abuse occurred." The Indiana Department of Child Services requested that [Father] address through counseling his sexual abuse of his step-daughter, [R.W.], and its effect on his parenting of [Children]. . . .

* * * * *

. . . Here the recommendation that [Father] participate in sex offender training is reasonable considering this Court found by a preponderance of the evidence that [Father] had sexually abused [R.W.] over a period of years when she was a minor child.

Certainly, as Indiana courts have stated [Father] does not leave his constitutional rights at the door when he enters sex offender treatment and may refuse to answer questions which he believes might be used against him. Should he invoke his Fifth Amendment right; [sic] however, the Court may also infer what his answer might have been and whether or not he has successfully completed the treatment program. Ultimately, this Court will have to make a determination whether or not the conditions that lead [sic] to the [C]hildren's removal have been remedied. If [Father] refuses to and has not successfully completed the treatment program, it would appear that the conditions that lead [sic] to the [C]hildren's removal have not been remedied.

(Father's App. Vol. II at 76-7.)

[17] The trial court's own statements here illustrate why the Fifth Amendment right is so extremely important. The Court seems to consider Father's exercise of his constitutional right to remain silent to be equivalent to an admission of guilt. The trial court also seemed to suggest Father had a choice – either admit the molestation or take a polygraph. Father argues this is not a constitutionally-permissible choice – it is an impermissible exercise of the trial court's power to force Father to waive his Fifth Amendment right against self-incrimination. (Br. of Father at 15.)

[18] DCS did not respond to the merits of Father's Fifth Amendment argument. Instead, DCS contends the law-of-the-case doctrine applies here and can be used to force Father to make an admission of sexual abuse. (*See* Br. of Appellee at 22.) In support, DCS cites Father's appeal of the underlying CHINS determination, in which our court affirmed the trial court's finding that Father committed sexual abuse against R.W. *See Matter of La.H.*, *slip op.* at 4 (affirming CHINS adjudication based, in part, on R.W.'s testimony of Father's sexual abuse).

[19] The law-of-the-case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the appellate court in any subsequent appeal involving the same case and substantially the same facts. *Dutchmen Mfg., Inc. v. Reynolds*, 891 N.E.2d 1074, 1082 (Ind. Ct. App. 2008), *trans. denied*. The purpose of the doctrine is to minimize unnecessary re-litigation of legal issues once they have been resolved by an appellate court. *Id.* Accordingly, all issues decided directly or by implication in a prior decision are binding in all further

portions of the same case. *Id.* However, questions not conclusively decided in the earlier appeal do not become the law of the case. *Id.* at 1083. Contrary to DCS's assertion, the law of the case doctrine does not apply here to prohibit Father from invoking the Fifth Amendment.

[20] First of all, while the CHINS and termination proceedings involve the same parties (*i.e.*, DCS and Parents) and the same issue (*i.e.*, whether Father sexually abused R.W.), the burdens of proof in CHINS and termination proceedings are different. The burden of proof in a CHINS case is preponderance of the evidence, Ind. Code § 31-34-12-3, while the burden of proof in a termination of parental rights case is clear and convincing evidence, Ind. Code § 31-37-14-2, which is defined as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain." *Clear and convincing evidence*, Black's Law Dictionary 674 (10th ed. 2014). Clear and convincing "is a greater burden than preponderance of the evidence . . . ." *Id.* Because the second proceeding required a greater level of proof, the first proceeding could not "conclusively decide" issues to be decided in the second proceeding. *See McNabb v. Mason,* 148 Ind. App. 233, 241, 264, N.E.2d 623, 627 (1970):

> [A] trial court upon summary judgment motion cannot, nor can we upon appeal, prejudge a plaintiff's ability to sustain his, or in this instance, her burden of proof upon the factual issues. The existence of factual issues, however, is quite a different question from that concerning the burden of establishing, as a matter of evidentiary proof, the facts alleged by plaintiff. We are here concerned only with the former question. We cannot prejudge that matter.

[21] Second, the admission DCS asserts Father should have to make in treatment is not an admission that he has the luxury of making only by a preponderance of the evidence or by clear and convincing evidence. If Father admits that he sexually abused a child, it will be an admission that meets the burden of proof in criminal proceedings, which is "beyond a reasonable doubt." Ind. Code § 35-41-4-1. *See Everhart v. Scott Cty. Office of Family & Children*, 779 N.E.2d 1225, 1231 (Ind. Ct. App. 2002) (Indiana's privileged communication laws meant "the social worker could have disclosed any information revealed by Everhart which would have indicated his guilt in the abuse of A.E. Therefore, Everhart's only recourse to protect himself was to invoke his Fifth Amendment right against self-incrimination as he did.")

[22] Additionally, while the State characterizes the sex offender treatment as one that gives Father the option to admit to the allegations OR take the polygraph, in reality, after taking and failing the polygraph, the sex offender treatment continued to hinge on Father's admission of the allegations, as evidenced in the trial court's findings:

> 93. Due to [Father's] denial of the allegations, Michael, Phoenix Associates' service provider, suggested that [Father] take a polygraph. If the polygraph showed that [Father] was telling the truth, then [Father] would be released from the program. *If the polygraph showed that [Father] was deceptive, then [Father] would have to admit to the allegations.*

* * * * *

97.  [Father] completed his polygraph examination on May 15, 2017.

98.  The polygraph results indicated that [Father] was deceptive to the main issue, which was the sexual abuse that occurred by [Father] on his step-daughter, [R.W.].

99.  Based on the polygraph examination, Phoenix recommended that [Father] *complete its Sex Offender Management and Monitoring program, which would require [Father] to admit and take ownership of the sexual abuse against his step-daughter, [R.W.].*

(Father's App. Vol. II at 118) (emphases added).

[23]  Our Indiana Supreme Court addressed the Fifth Amendment implications of admitting a sexual offense as part of sex offender treatment in *Bleeke.* In that case, Bleeke was on parole following his conviction of residential entry and attempted criminal deviate conduct. *Bleeke,* 6 N.E.3d at 912.  As part of his parole, Bleeke was required to participate in and successfully complete a court-approved sex offender treatment program. *Id.* As part of the program, Bleeke "was required to admit guilt for his offense; refusal to do so, or to otherwise deny responsibility for the offense, would result in him being unsuccessful in his treatment[.]" *Id.*

[24]  Our Indiana Supreme Court held this requirement, that Bleeke admit to his offense, which he denied, had the potential to violate Bleeke's Fifth Amendment right against self-incrimination because "from the implications of the question, in the setting in which it is asked, a responsive answer to the

question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 927 (quoting *Hoffman*, 341 U.S. at 486-7). Our Indiana Supreme Court then examined whether Bleeke was compelled to "to provide self-incriminating testimony because of the SOMM[5] program requirements that he admit his guilt to the underlying conviction and answer questions about his prior sexual history." *Id.* at 925 (footnote added). Our Indiana Supreme Court concluded Bleeke's Fifth Amendment rights were not implicated:

> Here, Bleeke's compliance with the SOMM program and performance of polygraphs is an express condition of his parole and is highly relevant to his successful reintegration into society. And this is not a circumstance where the trial court is setting a more lenient sentence for Bleeke, and then threatening to increase that sentence if Bleeke fails to admit his guilt for the underlying offense.

> \* \* \* \* \*

> Bleeke's early release from imprisonment to parole is a matter of executive and legislative grace and clemency. It is a privilege afforded to him - a lower grade of punishment - for his compliance with prison rules and policies, including the SOMM program, as well as any number of other behavioral or rehabilitative programs that the DOC and General Assembly might endorse. It neither excuses, nor waives, nor vitiates the remainder of his fixed term of his imprisonment. And the

---

[5] "SOMM" refers to Indiana's Sex Offender Management and Monitoring Program, which is program available to sex offenders while incarcerated. *Indiana Sex Offender Management and Monitoring*, https://www.in.gov/idoc/3512.htm (last visited January 9, 2019).

revocation of his parole does not mean he goes from being at full liberty to being fully detained, as he portrays it - instead it means he goes from being detained at a comparatively low level back to being fully detained. In that way it is little different, in the pure legal sense, than him being reassigned from a minimum-security facility, or a community transition program, to a medium- or maximum-security facility for violating prison rules and policies.

*Id*. at 937-38.

[25] The case before us is distinguishable, as the liberty interest Father has at stake here is significant – his right to remain free of incarceration without the State proving his guilt beyond a reasonable doubt based on his coerced admission. *Contra id*. at 938 ("the revocation of [Bleeke's] parole does not mean he goes from being at full liberty to being fully detained"). Because Father has not been convicted of crimes based on R.W.'s allegations, we agree the requirement that he admit committing those crimes implicates his Fifth Amendment right against self-incrimination. *See McCarthy v. Arndstein*, 266 U.S. 34, 41 (1924) (holding the privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it").

### *Father's Due Process Rights*

[26] Because Father's Fifth Amendment right was implicated, we turn to whether his assertion of that right resulted in a deprivation of his due process rights. In a termination of parental rights proceeding, parents have certain due process rights:

When a State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due process clause. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982). Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." *E.P. v. Marion County Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 26, 101 S. Ct. 2153, 68 L.Ed.2d 640 (1981)). Citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976), this court has recently acknowledged that the nature of the process due in parental rights termination proceedings turns on a balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter County Office of Family and Children*, 734 N.E.2d 1107 (Ind. Ct. App. 2000)[, *reh'g denied*].

*J.T. v. Marion Cty. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *reh'g denied*, *trans. denied*, *abrogated on other grounds by Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004) (abrogating *J.T.*'s holding regarding sufficiency of counsel).

[27] Father acknowledges that both DCS and Parents have substantial interests affected by the termination proceedings, and he argues there is an insurmountable risk of error created by DCS's and the trial court's actions. Specifically, Father contends:

> [N]umerous due process violations occurred which culminated in the termination of his parental rights, and further led to a lack of evidence to support the Trial Court's determination. Specifically, the allegations that a child (now adult) was sexually abused by

Father, and that victim is not a party to the action and there were no allegations of similar abuse on any of the six (6) biological children of this action. Further, Father argues that he was given an impossible decision and was compelled to testify against himself and forfeit his Fifth Amendment Constitutional right, or lose his constitutional right to the care, custody and control of his children by himself and his wife. Said another way, Father argues the only path made available to him in order to maintain his right to raise his children with his Wife, was to admit to a crime he maintains he did not commit, or to use a polygraph test to prove his innocence, even though polygraph tests have been long-held as inadmissible due to their unreliability.

(Br. of Father at 28-9.)

[28]     We addressed a similar issue in *Everhart*, in which a father's rights were terminated in part because he invoked his Fifth Amendment right against self-incrimination and would not admit as part of court-ordered therapy that he had abused a child. In *Everhart*, we set forth a series of factors, based on those used in a criminal context, to be used to determine whether the trial court's decision to terminate parental rights was prejudicially impacted by the parent's Fifth Amendment silence: "(1) the use to which the fact of the invocation of the right against self-incrimination is used, (2) who elected to pursue the line of questioning, (3) the amount of other evidence supporting the termination of parental rights, and (4) the intensity and frequency of the reference." *Everhart,* 779 N.E.2d at 1231. We held that Everhart was not denied due process because significant other evidence supported the termination of his parental rights. *Id.* at 1235.

[29]     Here, Father's refusal to admit he sexually abused R.W., which precluded his completion of sex offender treatment, was a large part of the trial court's reason for terminating his parental rights. Mother also denied Father's abuse of R.W., and her failure to acknowledge the alleged abuse and create a safety plan to address any risk was the only reason her parental rights were terminated, because she successfully completed all available services. The trial court also found that Father refused to participate in individual counseling and minimally participated in substance abuse treatment, which would be sufficient to terminate Father's parental rights under circumstances where the entire process is not tainted with the violation of Father's constitutional rights.

[30]     While we acknowledge DCS is not required to offer every possible type of service, we believe the services here, considering the special circumstances of the case, were not offered in a way that was conducive to reunification of the family. Father has been denied access to Children for the pendency of the proceedings based on a substantiated but unproven allegation. The requirements of this treatment, we have concluded, violate Father's Fifth Amendment right against self-incrimination.

[31]     There is also conflicting evidence regarding Father's participation in substance abuse treatment. Father's therapist from Dockside testified Father participated in the required number of meetings, but did not seem to be engaged in the

treatment or to be receiving benefit therefrom.[6] However, Father's therapist from Dockside also testified he had not witnessed Father under the influence of alcohol and Father consistently tested negative for alcohol. Father's therapist from Dockside also indicated DCS's referral was based in part on an incident in which Father was arrested for driving under the influence of alcohol over ten years prior to DCS involvement. Finally, the trial court found Father did not complete individualized therapy because he did not attend the scheduled sessions, however, Father testified at the termination hearing that, absent those services related to the sexual abuse allegations, he believed he was compliant with the services ordered by the trial court in its dispositional decree.

[32] Therefore, we conclude the use of Father's silence and subsequent results of the polygraph violated Father's due process rights because, based on the totality of

---

[6] We also note that it is troubling that, at the oral argument, DCS asserted the termination of parental rights could be supported by speculation.

> Judge Robb: When there is nothing in the record, can we terminate parental rights based on a supposition? Just a simple yes or no would be sufficient.
>
> DCS: Yes.
>
> Judge Robb: We can terminate parental rights on a supposition without evidence in the record to support that supposition?
>
> DCS: Well, I guess I disagree that there's no evidence in the record, your honor.
>
> Judge Robb: Well you haven't shown it to us yet. Thank you.

Indiana Court of Appeals Oral Arguments Online, *R.H. (Mother) and M.H. (Father) v. Indiana Department of Child Services*, (November 28, 2018, 43:09 - 43:31), https://mycourts.in.gov/arguments/default.aspx?&id=2274&view=detail&yr=&when=&page=1&court=app&search=&direction=%20ASC&future=False&sort=&judge=&county=&admin=False&pageSize=20 (last accessed January 11, 2019). This is an incorrect statement of law. *See, e.g., In re V.A.*, 51 N.E.3d 1140, 1146 (Ind. 2016) ("the constitutional guarantees of the Fourteenth Amendment and the heightened burden requirements of our state statutes dictate that such determination must be founded on factually-based occurrences as documented in the record - not simply speculation or *possible* future harms.") (emphasis in original).

the circumstances, the violation of Father's Fifth Amendment right unfairly influenced his participation and completion of other required services.[7] *See Matter of C.M.S.T.*, 111 N.E.3d 207 (Ind. Ct. App. 2018) (unique, cumulative circumstances existing during CHINS proceedings which affected parents' ability to engage in and complete services warranted reversal of termination of parents' rights to their respective children). Accordingly, we disregard any findings related to Parents' failure to complete any requirement of the dispositional decree related to the allegations of sexual abuse made by R.W. *See In re B.J.*, 879 N.E.2d 7, 21 (Ind. Ct. App. 2008) ("This Court is to disregard any special finding that is not proper or competent to be considered."), *trans. denied.*

[33] Regarding Mother, it is undisputed between the parties that Mother completed all services as ordered except those that addressed the sexual abuse allegations against Father. As those findings were in error, there were no other findings to support the termination of Mother's parental rights to Children. Therefore, we reverse the termination of Mother's parental rights to Children. *See Bester,* 839 N.E.2d at 153 (reversal of termination of parental rights appropriate when there are no findings to support the trial court's conclusions regarding termination).

---

[7] We note DCS did not attempt to locate a sex offender treatment program that did not require Father to admit to the allegations against him. While DCS certainly is not required to exhaustively search for relevant rehabilitative treatment programs that suit parents' preferences, *see, e.g., Steward v. Randolph Cty. Office of Family & Children*, 804 N.E.2d 1207, 1214 (Ind. Ct. App. 2004) (DCS is not required to offer alternative programs to parents to ensure compliance with dispositional order), *trans. denied*, the services required by DCS ought not violate parents' constitutional rights.

# Conclusion

[34] The requirement that Father admit to sexually abusing R.W. as part of sex offender treatment violated Father's Fifth Amendment rights. Because of this unusual situation, we reverse the termination of Mother's and Father's parental rights to Children. We remand to the trial court for reinstatement of the CHINS cases, a re-examination of the requirements for reunification, and a revised dispositional order outlining the services consistent with the holdings in this opinion that Parents must complete to reunify with Children.

[35] Reversed and remanded.

Baker, J., concurs.

Robb, J. dissents with separate opinion.

| | |
|---|---|
| In the Matter of the Parent-Child Relationship of Ma.H., Le.H., Lo.H., W.H., La.H., Me.H., and S.W. (Children) and M.H. (Father) and R.H. (Mother); | Court of Appeals Case No. 18A-JT-1296 |
| M.H. (Father) and R.H. (Mother), | |
| *Appellants-Respondents,* | |
| v. | |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Robb, Judge, dissenting.**

I respectfully dissent.

[36]    I agree with the majority that it is a bedrock principle of our criminal justice system that the Fifth Amendment protects a person from being involuntarily called as a witness against himself in a criminal case and also protects a person from having the refusal to testify in a civil case used against him in subsequent criminal proceedings. *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *see* slip op. at

¶¶ 14-15. As a practical matter, I believe the majority opinion is written with too broad a brush: if a parent in a future CHINS/termination case says he or she did not do the act which precipitated DCS involvement in the family and refuses to participate in treatment designed to address the issue for fear of criminal reprisals, then DCS could not prove a termination case. It would encourage refusal to participate in treatment.

[37]   Moreover, in focusing on the possible criminal repercussions of an admission, the majority fails to acknowledge that a civil defendant who chooses to avail himself of the Fifth Amendment privilege "does so at his peril" because the Fifth Amendment does *not* forbid adverse inferences against a party to a civil proceeding who refuses to testify in that proceeding. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1152 (Ind. 2014). In its January 31, 2017, Order on Matters Taken Under Advisement; Parental Participation and Visitation, the trial court noted as much:

> Certainly, as Indiana courts have stated, [Father] does not leave his constitutional rights at the door when he enters sex offender treatment and may refuse to answer questions which he believes might be used against him. Should he invoke his Fifth Amendment right; however, the Court may also infer what his answer might have been and whether or not he has successfully completed the treatment program.

[38]   Appendix of Appellant/Father, Volume II at 76-77. In other words, the Fifth Amendment shields Father from being compelled to give possibly incriminating statements but it does not shield him from the consequences of asserting that

right. Here, the consequences included the possibility of termination of his parental rights for failing to participate in meaningful therapy.[8]

[39] R.W. testified at the CHINS fact-finding hearing and again at the termination fact-finding hearing that she was sexually abused by Father when she was a minor living in the home. Father denied the abuse and despite polygraph results that indicated he was being deceptive regarding this issue, refused to participate in sex offender treatment as a part of the family reunification plan. The trial court was in the position of determining the credibility of the witnesses and specifically found R.W.'s testimony about sexual abuse by Father to be credible. App. of Appellant/Father, Vol. II at 112. In addition, the trial court was entitled to draw an adverse inference from Father's invocation of the Fifth Amendment to avoid the requirements of the treatment program.

[40] However, even accepting Father's position that he should not have been required to take a polygraph test or admit to wrongdoing and making no negative inference from his invocation of the Fifth Amendment, the essence of

_____

[8] The trial court found during the CHINS proceeding that the DCS recommendation that Father participate in sex offender treatment was reasonable because the court had determined by a preponderance of the evidence that Father had sexually abused R.W. when she was a minor. *See id.* at 76. DCS was required to provide options for sex offender treatment programs within sixty miles of Father's residence and to make a referral to Father's chosen program. *See id.* at 77. The trial court's order did not require Father to admit to the truth of the sexual abuse allegations and it did not require Father to participate in a specific therapy program that would mandate an admission of guilt; rather, it required him to participate in a sex offender treatment program of his own choosing. Several states have concluded that there is a distinction between a court-ordered case plan that mandates admission of guilt either through a direct admission or participation in a treatment program that specifically mandates an admission for family reunification and one that requires meaningful therapy. *See Matter of A.D.L.*, 402 P.3d 1280, 1285-86 (Nev. 2017) (citing cases from other jurisdictions).

this case is that which we often encounter: Father says he did nothing wrong and R.W. says otherwise. The trial court found R.W. to be a more credible witness than Father and again, determining credibility and weighing conflicting evidence is the trial court's province. *In re E.M.L.*, 103 N.E.3d 1110, 1115 (Ind. Ct. App. 2018), *trans. denied*. Conceding to Father the Fifth Amendment issue, we are left with Father's denial, R.W.'s testimony, a court order that did not specifically require an admission of wrongdoing as a requirement for reunification, Father's failure to participate in treatment in even a limited way, and the trial court's credibility determination. There are safety concerns that have not yet been addressed due to Father's minimal compliance and lack of engagement and Mother's unwillingness to acknowledge and implement a plan to address the safety concerns. Therefore, the trial court's determination there has not been substantial progress towards reunification is not clearly erroneous and I would affirm the trial court's judgment.