

FILED

Oct 31 2019, 12:16 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-JT-323

## In the Matter of Ma.H., Le.H., Lo.H., W.H., La.H., Me.H., and S.W. (Minor Children); M.H. (Father) and R.H. (Mother),

*Appellants (Respondents)*

–v–

## Indiana Department of Child Services,

*Appellee (Petitioner)*

---

Argued: June 18, 2019 | Decided: October 31, 2019

Appeal from the Wells Circuit Court,
Nos. 90C01-1707-JT-22, -29, -30, -31, -32, -34, -35
The Honorable Kenton W. Kiracofe, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 18A-JT-1296

---

**Opinion by Chief Justice Rush**

Justices David, Massa, Slaughter, and Goff concur.

**Rush, Chief Justice.**

Civil child welfare proceedings often implicate a parent in criminal activity. In such cases, the trial court needs to strike a delicate balance: it must safeguard children's well-being, while protecting parents' constitutional rights.

Here, a mother and a father appeal the termination of parental rights to seven children, arguing that the trial court violated the father's Fifth Amendment privilege against self-incrimination. After a court found that the father sexually abused his stepdaughter, he was required to select and complete a sex-offender treatment program. He briefly attended a program but stopped when it required an admission of wrongdoing. The father has always denied the sexual abuse, and the mother has likewise never believed her daughter.

We find no constitutional violation. The trial court's order did not require the father to admit to a crime at the risk of losing his parental rights. And because the parents failed to address the sexual abuse allegations—several of which a court found were true—we find sufficient evidence to support the trial court's termination decision and affirm.

# Facts and Procedural History

M.H. (Father) and R.H. (Mother) have a blended, Amish family of nine children. Seven of the children were born during their marriage; the oldest two, S.W. and R.W., are Mother's daughters from a prior relationship.[1]

In early spring 2016, seventeen-year-old R.W. abruptly left home. About a week later, the Department of Child Services (DCS) received a report alleging that Father had sexually abused R.W. for years and that the condition of Parents' home was unacceptable. Parents denied both allegations; but after a detective interviewed R.W., DCS removed the

---

[1] Neither Parents' youngest child nor R.W. are part of this appeal. Thus, the term "children" hereafter refers only to the seven other children.

remaining children from the home. They were placed with their maternal uncle and his family, who are also part of the Amish community.

DCS alleged the children were in need of services (CHINS) based on the Parents' actions. At the hearing, DCS provided testimony on the home's deplorable condition, and R.W. testified to numerous and specific instances of sexual abuse by Father. The court found the children to be CHINS, noting that R.W.'s testimony was credible and that most of the allegations in DCS's petition were true.

As a result, Parents were ordered to complete services, including ones to address sexual abuse. Specifically, Father had to complete sex-offender treatment; and Parents were required to create a safety plan to protect the children from future abuse.

Father objected to the sex-offender treatment. He was concerned that completing such a program would involve a polygraph examination, which he argued would require him to waive his Fifth Amendment privilege against self-incrimination. The trial court disagreed. In its order, the court explained that Father could refuse to answer questions during treatment, but that if Father chose to remain silent, then the court could "infer what his answer[s] might have been."

About a month later, Father began sex-offender treatment. But because of his continued denial, little progress was made. So, the therapist recommended a polygraph test to show that Father had done nothing wrong—"to help things move forward." Father took the polygraph, and the results showed he was "deceptive" when asked about the sexual abuse.

At that point, the therapist could not continue the program with Father unless he admitted wrongdoing. Father refused and stopped attending. During this time, Mother never wavered in her support of Father or in her belief that R.W. lied about the sexual abuse. Thus, Father never completed sex-offender treatment, and Parents never created a safety plan.

In late summer 2017, DCS petitioned to terminate parental rights, citing Parents' failure to adequately address the CHINS court's finding that Father sexually abused R.W. During a four-day hearing, R.W. described

Father's sexual abuse and explained that she twice told Mother about it, including once after the first encounter. The court also heard testimony about Father's failure to complete sex-offender treatment; Parents' continued denial of R.W.'s allegations; and Parents' failure to develop a safety plan. Additionally, both the children's guardian ad litem (GAL) and a DCS caseworker recommended termination. A few months later, the trial court terminated Parents' parental rights.

Mother and Father both appealed, and a divided panel reversed. *In re Ma.H.*, 119 N.E.3d 1076, 1090 (Ind. Ct. App. 2019). The majority concluded that Father's Fifth Amendment rights were violated and reversed the termination. *Id.* Judge Robb dissented, believing that no Fifth Amendment violation occurred and that sufficient evidence supported the court's decision. *Id.* at 1091–92, 1091 n.8 (Robb, J., dissenting).

DCS petitioned for transfer, which we granted, vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).

## Standard of Review

This challenge to the trial court's termination decision invokes two standards of review.

We affirm a trial court's termination decision unless it is clearly erroneous; a termination decision is clearly erroneous when the court's findings of fact do not support its legal conclusions, or when the legal conclusions do not support the ultimate decision. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We do not reweigh the evidence or judge witness credibility, and we consider only the evidence and reasonable inferences that support the court's judgment. *In re K.E.*, 39 N.E.3d 641, 646 (Ind. 2015). But to the extent our analysis depends on whether Father's Fifth Amendment privilege against self-incrimination was violated, we review that purely legal question de novo. *See Bleeke v. Lemmon*, 6 N.E.3d 907, 917 (Ind. 2014).

# Discussion and Decision

Parents have a fundamental right to raise their children—but this right is not absolute. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated. *Id.*

To terminate parental rights, Indiana law requires DCS to prove certain elements by clear and convincing evidence. Ind. Code §§ 31-35-2-4(b)(2); 31-37-14-2 (2018). We focus today on two: (1) a reasonable probability that the conditions that resulted in the children's removal will not be remedied;[2] and (2) that termination is in the children's best interests. I.C. § 31-35-2-4(b)(2)(B)(i), (C).

Here, the trial court determined that DCS met its burden on both elements. Parents argue that the trial court's conclusions are clearly erroneous.

Specifically, they assert that the trial court violated Father's Fifth Amendment privilege against self-incrimination; and thus, the trial court erred in considering evidence of Parents' response to services addressing the CHINS court's finding that Father sexually abused R.W. Father argues that, when the improperly considered evidence is removed, there remains insufficient evidence to support the court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied. And each parent similarly argues that there is insufficient evidence to support the trial court's conclusion that termination is in the children's best interests. We disagree.

Our review of the record shows there is no constitutional violation because the court never ordered Father to admit to a crime. We also find

---

[2] Section 31-35-2-4(b)(2)(B) requires DCS to make one of three showings. The trial court here found that DCS met its burden on two: (1) a reasonable probability that the reasons for removal will not be remedied; and (2) a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being. I.C. § 31-35-2-4(b)(2)(B)(i), (ii). Because we determine that the court's findings support its conclusion on the former, we need not address the latter. *See K.T.K.*, 989 N.E.2d at 1234.

that the evidence favorable to the trial court's decision supports its factual findings, which in turn support its challenged legal conclusions. Thus, Parents have failed to show that the trial court's termination decision is clearly erroneous.

# I. There is no Fifth Amendment violation.

CHINS proceedings and proceedings to terminate parental rights (TPR), though non-criminal, can implicate a parent in criminal activity. For example, a CHINS or TPR petition may include allegations of neglect, physical abuse, illegal drug activity, human trafficking, endangerment, or sexual abuse—each its own criminal offense carrying serious consequences. *Compare* I.C. §§ 31-34-1-1, -2(a), -2(d), -3, -4, *with* Ind. Code §§ 35-46-1-4, -42-2-1, -42-4-1, -48-4-1.2 (2018).

As a result, trial courts presiding over CHINS and TPR proceedings must remain conscientious of possible criminal implications and safeguard a parent's constitutional rights—such as those guaranteed by the Fifth Amendment, including the privilege against self-incrimination. Father argues that the trial court violated this privilege "by expressly requiring him to confess to a crime for which he was never charged."

Generally, in any proceeding—civil or criminal—the Fifth Amendment protects an individual from being compelled to answer questions when the answers might be used in a future criminal proceeding. *See Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *Bleeke*, 6 N.E.3d at 925. This means that, in CHINS and TPR proceedings, a court may not compel a parent's admission to a crime—if the admission could be used against him or her in a subsequent criminal proceeding—under the threat of losing parental rights. *See In re A.D.L.*, 402 P.3d 1280, 1285 (Nev. 2017) (collecting cases). *See generally Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) ("[W]hen a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment[.]").

Yet, in civil proceedings, a court can draw a negative inference from a claim of the Fifth Amendment privilege against self-incrimination. *See*

*Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1152 (Ind. 2014). To that end, the trial court here noted that Father could choose not to answer questions during sex-offender treatment, but the court could then "infer what his answer[s] might have been." The trial court was correct. Ultimately, though, Father voluntarily took the polygraph, so there was no silence from which to draw an adverse inference. Our inquiry then is whether any court action forced Father to choose between losing his parental rights and waiving his right against self-incrimination.

"[T]here is a distinction between a court-ordered case plan that mandates admission of culpability for family reunification and one that requires meaningful therapy for family reunification." *A.D.L.*, 402 P.3d at 1286. While the former constitutes a Fifth Amendment violation, the latter does not. *Id.* Here, the trial court ordered Father to "select" and "complete a course of sex offender treatment" from options that DCS would provide, within sixty miles of his home. Father began a sex-offender treatment program that ultimately required him to admit wrongdoing after a voluntary polygraph showed deceptive denials of misconduct. Refusing to admit to sexual abuse, Father stopped attending.

We recognize that Father attended a program that eventually required an admission of guilt. But the trial court's order did not compel Father to admit to a crime; the order simply required Father to select and complete a course of sex-offender treatment. *See Ma.H.*, 119 N.E.3d at 1091 n.8 (Robb, J., dissenting). Other states have made a similar distinction. *See In re A.W.*, 896 N.E.2d 316, 326 (Ill. 2008) ("[A] trial court may order a service plan that requires a parent to engage in effective counseling or therapy, but may not compel counseling or therapy requiring the parent to admit to committing a crime."); *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) ("The State may require parents to otherwise undergo treatment, but it may not specifically require an admission of guilt as part of the treatment.").

Father, nonetheless, asserts that the trial court's order "created a requirement for [him] to testify against himself and make an admission of a specific crime." In other words, Father seemingly argues that, even if the

court order didn't explicitly mandate him to participate in a program that would require an admission, this was the order's practical effect. Yet, Father points to no evidence that he sought out a different program; that he requested DCS to provide him with other options; or that there were no treatment programs available, within sixty miles of his home, that did not require an admission of sexual abuse. *See A.W.*, 896 N.E.2d at 326 (noting that the court did not order the parent "to complete a specific program requiring him to admit abuse" and pointing out that the parent had "presented no evidence that there are no other treatment programs available offering sex offender counseling without requiring an admission of sexual abuse"); *C.H.*, 652 N.W.2d at 150 (finding no evidence that the State required the father "to complete any particular sexual offender treatment program" or "disapproved of [the father's] participation in a treatment program that would not require an admission of guilt").

In sum, the trial court did not violate Father's Fifth Amendment privilege against self-incrimination. And so the trial court could properly consider evidence of Parents' failure to respond to services addressing the CHINS court's finding that Father sexually abused R.W.

The trial court relied on this evidence, and other evidence in the record, to support its conclusions that there is a reasonable probability that a primary reason for the children's removal will not be remedied and that termination is in the children's best interests. We now address whether that evidence was sufficient.

## II. The evidence-backed findings support the trial court's conclusion that there is a reasonable probability that a primary reason for the children's removal will not be remedied.

Father argues there is insufficient evidence to clearly and convincingly show that there is a reasonable probability that the conditions leading to the children's removal will not be remedied. He is incorrect.

Here, the trial court's findings show that it engaged in the appropriate two-step analysis. *See In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010). First, it identified the removal conditions. *Id*. Specifically, the court found that the children were removed, in relevant part, because of Father's alleged long-term sexual abuse of R.W. Second, the trial court made findings on whether there is a reasonable probability that this removal condition will not be remedied. *Id*. On that point, the court found that despite Father's "history of substantiated sexual abuse of his stepdaughter," he "failed to complete . . . sex offender specific treatment, and has refused to admit he has a problem." Ample evidence in the record supports these findings.

Turning to that evidence, there is no dispute that the CHINS court found several of R.W.'s sexual-abuse allegations to be true, including the following: When R.W. was a young girl, Father told R.W. to come into his bedroom where he pulled her on top of him. She said that she "didn't understand what was happening" and "was frightened." On another occasion, R.W. was asleep on the couch and woke up to Father on top of her, touching his penis to her vagina. A couple of years later, Father told R.W. to take water to the horses in the barn. Once inside the barn, Father pulled his pants down and inserted his fingers and then his penis into R.W.'s vagina while she cried. R.W. also testified at the termination hearing, explaining that Father molested her "almost all the time I was left alone with him," until she was a teenager.

Similarly, there is no dispute that Father did not complete a sex-offender treatment program. In fact, at the termination hearing, Father displayed resentment toward the court-ordered service. When Father was asked if he agreed that he needed to attend sex-offender treatment, he responded, "No." When asked whether he felt that he could benefit from the treatment, Father responded, "I don't know how I could." And most notably, when Father was asked what he had done to remedy R.W.'s claims that he molested her, he responded, "Nothing." By his own words, Father conceded that he has done **nothing** to remedy a primary reason for the children's removal.

Ultimately, the court's findings—that Father repeatedly sexually abused his stepdaughter and that he failed to complete sex-offender

treatment—are supported by the evidence. And those findings clearly and convincingly support the trial court's conclusion that there is a reasonable probability that a primary reason for the children's removal—R.W.'s sexual abuse allegations against Father—will not be remedied.

We now address whether sufficient evidence supports the trial court's conclusion that termination is in the children's best interests.

## III. The evidence-backed findings support the trial court's conclusion that termination is in the children's best interests.

Parents each argue that there is insufficient evidence to clearly and convincingly show that termination is in the best interests of the children. Specifically, Father alleges that terminating all parental rights based on a "sole allegation" of sexual abuse is not in the children's best interests. And Mother maintains that she completed all services offered to her and her continued support of Father is likewise not sufficient to show termination is in the children's best interests. We disagree. Parents' arguments are a request for us to reweigh the evidence and substitute our judgment for that of the trial court, which we will not do. Instead, looking at the evidence favorable to the trial court's ruling, we find ample evidence supporting the court's findings, which in turn support its best-interests conclusion.

Deciding whether termination is in children's best interests is "[p]erhaps the most difficult determination" the trial court must make. *E.M.*, 4 N.E.3d at 647. To make this decision, trial courts must look at the totality of the evidence and, in doing so, subordinate the parents' interests to those of the children. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* Central among these interests is children's need for permanency. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Indeed, "children cannot wait indefinitely for their parents to work toward preservation or reunification." *E.M.*, 4 N.E.3d at 648.

The trial court here echoed the children's need for permanency, noting that Parents have had plenty of time "to accomplish the steps necessary to

have the children returned to their care." Those "steps" included Parents' addressing R.W.'s allegations of sexual abuse against Father—several of which the CHINS court found to be true. Yet, Parents failed to address the sexual abuse, and the court made many findings on this failure. It referenced Father not completing a sex-offender treatment program; Father not believing that he needed treatment or that he would benefit from it; Mother dismissing R.W.'s claims and refusing to acknowledge the sexual abuse; Mother not believing Father posed any potential danger to her other children; and testimony from others showing concern for the children's safety if they were to return without a safety plan in place and with Father not having completed treatment. Evidence in the record supports each finding.

The evidence supporting the court's findings on Father is well-documented: he did not complete a court-ordered sex-offender treatment program; and he testified that he does not need treatment and does not believe he could benefit from it.

The evidence similarly supports the trial court's findings on Mother. Mother testified at the termination hearing that R.W. never mentioned anything to her at the time of Father's alleged sexual abuse. But R.W. later confirmed that she twice told Mother about the abuse, including once after the first time it happened. Mother has also twice listened to her daughter provide specific, detailed testimony of Father's sexual abuse. And R.W. recalled a more recent conversation with Mother, which ended with Mother telling R.W. to "basically, forgive and forget—just get over what happened." Yet, Mother testified at the termination hearing that she has never believed R.W. and does not believe Father poses any danger to the children. Mother is free to believe Father, but the trial court—responsible for resolving conflicting testimony—believed R.W. *See Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 149 (Ind. 2005).

Finally, the evidence supports the trial court's findings on a concern for the children's well-being if returned home. Specifically, the court heard testimony from four witnesses who shared a concern for the well-being of the children should they return home without a safety plan in place and without Father having completed treatment.

A psychologist testified that, when one child is sexually abused within a home, there is a similar risk to the other children in that home. The GAL shared her trepidation on returning the children: "[W]e have no safety plan in place, we have no plan where [Mother] has talked to her individual therapist or anyone that she worked with about what she's gonna do to be a protective factor for her own children." R.W. similarly voiced her concern that her siblings wouldn't "get the proper care that they need," if they were to return home and Father hadn't changed. And a DCS caseworker testified that she feared for the children's safety if they were returned to the home without Father completing treatment.

Though we acknowledge that Mother and Father completed most of the required services, "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change," *In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Here, Parents have not made the needed change to address the CHINS court's finding that Father sexually abused R.W. or to protect the other children from future abuse. As the GAL observed, the children are "no closer to being reunified" than when they were removed "twenty months ago."

In sum, the totality of the evidence above supports the trial court's findings, which in turn support the court's best-interests conclusion.

## Conclusion

The trial court did not violate Father's Fifth Amendment privilege against self-incrimination, and the court's decision to terminate Parents' parental rights is not clearly erroneous. We thus affirm.

David, Massa, Slaughter, and Goff, JJ., concur.

ATTORNEY FOR APPELLANT M.H.

Yvonne M. Spillers

Fort Wayne, Indiana

ATTORNEY FOR APPELLANT R.H.

Mark Small

Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.

Attorney General of Indiana

Stephen R. Creason

Chief Counsel

Katherine A. Cornelius

Robert J. Henke

Deputy Attorneys General

Indianapolis, Indiana